[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-12826

_____

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**March 10, 2004**
**THOMAS K. KAHN**
**CLERK**

D.C. Docket No. 02-02998-CV-TWT-1

TOM A. FURNES,

Plaintiff-Appellant,

versus

PAMELA KAY REEVES,

Defendant-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Georgia

_____

**(March 10, 2004)**

Before TJOFLAT, HULL and FAY, Circuit Judges.

HULL, Circuit Judge:

Plaintiff Tom A. Furnes filed a petition under the International Child

Abduction Remedies Act, 42 U.S.C. §§ 11601-11611 (1988) ("ICARA"), seeking

the return of his daughter Jessica to Norway from Georgia, where she now resides

with her mother, Defendant Pamela Kay Reeves.  Jessica was born in Norway in 1996 and lived there until 2001, when her mother visited the United States and later refused to bring Jessica back to Norway, in violation of Furnes's rights under Norwegian law and their custody agreement.  After an evidentiary hearing, the district court denied Plaintiff Furnes's ICARA petition.  After review and oral argument, we reverse.

## I. Factual Background

### A. Norwegian Court's Custody Order

Plaintiff Furnes, a citizen and resident of Norway, and Defendant Reeves, a citizen and resident of the United States, were married in 1994 and resided in Norway.  Their daughter Jessica was born on September 17, 1996, in Norway, and resided with both parents until they separated in January of 1998.

During and after their separation, Plaintiff Furnes and Defendant Reeves's relationship was marked by constant conflict, and they were unable to agree on the division of their assets or the custody of their daughter.  Defendant Reeves maintained custody of Jessica during the separation, and commonly thwarted Plaintiff Furnes's attempts to exercise his visitation rights.  Defendant Reeves also made serious allegations against Plaintiff Furnes (including that Furnes had physically threatened and abused Reeves and had poisoned Jessica), which were

2

later determined to be groundless. In addition, in December of 1998, there was a fire in the home of Defendant Reeves (the couple's former joint home), and Defendant Reeves was charged with arson and insurance fraud. Although ultimately acquitted, Defendant Reeves was ordered to pay a large civil judgment in connection with the fire.

On August 25, 1999, the Bergen City Court in Norway entered an order granting Plaintiff Furnes custody of his daughter Jessica. The Bergen City Court found that there was little doubt that Defendant Reeves played the "leading part" in the conflict between the parties, that unrest in Reeves's life negatively affected her ability to care for her daughter, and that, in light of her previous "sabotage" of Furnes's scheduled visits, it was not realistic to believe that Defendant Reeves would be able to respect an agreement granting access rights to Furnes. The Bergen City Court specifically found as follows:

> Production of evidence has shown that the level of conflict between the parties is high, and that there is little doubt as to that it is the defendant [Reeves] who is the leading part in this conflict. She emerges as the conflict instigator and has on several occasions made serious accusations against the plaintiff and other involved parties. These accusations have later proven to be completely groundless. . . .
> The court also finds grounds to comment that the defendant is presently involved in two cases with the plaintiff in two different courts: a dispute concerning a distribution of estate and the case concerning custody/access of the child. Moreover, she has been remanded in custody and is still charged with arson, insurance fraud and for filing

3

false complaints. In spite of this she is also involved in and has hired attorneys for a private legal dispute in connection with the purchase of a dog. Thus there is much unrest involved with her and this has undoubtedly a negative affect in regards to the care of the child.

   The defendant has furthermore shown a negative attitude to cooperating with the plaintiff concerning already determined access. . . . In this connection the court refers to that the defendant in several occasions has sabotaged the visits that have been determined by legally enforceable and provisional decisions concerning access. . . .

   It is the court's opinion that this episode clearly shows that the defendant has problems respecting the child's rights and protecting the child from conflicts between the parties. As maintained by the expert, the defendant can not differentiate between her own fears and skepticism and the child's fears and skepticism. Another situation that the court would like to mention in this connection is the episode that took place at the home of the plaintiff, where the defendant, in the presence of the expert, provoked a conflict with the plaintiff, knowing that the expert was preparing his report to be used in the upcoming case.

   The court is not in doubt that continuous conflicts at this level over a period of time will be harmful for the child.

In contrast, the Bergen City Court found, based in part on the testimony of

the psychiatrist assigned as the case expert, that Plaintiff Furnes was an

understanding and cooperative parent and was able to offer Jessica a secure home.

On that basis, the Bergen City Court concluded that, notwithstanding Jessica's

primary attachment to her mother, Furnes was best suited to maintain custody of

Jessica, as follows:

   The court agrees with the expert that the plaintiff is the party that emerges as the best suited person to care for Jessica, also taking into consideration the conflicts and cooperation problems between the parties. In the court's opinion, a transfer of custody to the plaintiff in itself might

4

reduce the possibilities for conflicts and thereby create more peace and quiet for the child. The plaintiff has shown that he is more aware of the child's situation in relation to the conflict than the defendant is, and there is little reason to believe that his negative attitude towards the other party will hinder the child from having contact with her mother. In this connection the court finds reason to refer to the following from the expert's report. . . .

"Ms. Reeves is the person that Jessica is primarily attached to. However, it is Mr. Furnes that has shown most understanding for Jessica's needs for regular contact with both parents and for her marked need for peace in her current situation. . . . In addition, Mr. Furnes, in his current situation, is able to offer Jessica a secure home and a more structured life than the mother can, though this can not be given decisive importance as one must expect Ms. Reeves' situation to improve with time."

Having concluded that Plaintiff Furnes was the more fit parent, the Bergen City Court granted custody of Jessica to her father, Plaintiff Furnes, and mere access rights to her mother, Defendant Reeves. Specifically, the Bergen City Court ordered that Jessica live with her father and that Defendant Reeves have access to Jessica on alternating weekends; alternating Wednesdays; alternating Christmas, New Year, and Easter holidays; and for two weeks over Jessica's summer vacation.

## B. Settlement Agreement

Defendant Reeves appealed the August 25, 1999, judgment of the Bergen City Court to the Norwegian Gulating Court of Appeals. In 2001, the parties reached an agreement regarding custody (the "Agreement"), which was approved by the Gulating Court, and the appeal was dismissed. Pursuant to the Agreement,

dated February 28, 2001, the parties would maintain "joint parental responsibility" for their daughter under Norwegian law; Jessica would live with her mother; and her father would have access to their daughter on certain days and at certain times. Specifically, the Agreement provided in relevant part as follows:

1. Today a court settlement has been entered into between Pamela Kay Reeves, date of birth and Nation ID No. 24.02.69 25270, hereinafter called the mother, and Tom Arne Furnes, date of birth and National ID No. 23.12.67 45788, hereinafter called the father.

2. The agreement concerns our child, Jessica Anne Kristine Furnes, date of birth and National ID No. 17.09.96 38072, hereinafter called the daughter.

3. <u>We shall have joint parental responsibility for our daughter</u>.

4. <u>The daughter shall live with her mother, who shall have custody of the child.</u>

5. <u>The father shall have the following access to the daughter</u>:

   a) Alternating weeks from Thursday at 4pm to Monday morning when the daughter is to be brought at school (kindergarten).

   b) Alternating fall vacations. During the fall vacation 2001 the daughter shall be with the mother.

   c) Alternating Christmas vacations. During the Christmas vacation 2001 the daughter shall be with the father.

   d) Alternating Easter vacations. During the Easter vacation 2001, from April 9, 2001 to April 17, 2001, the daughter shall be with the father.

   e) Three weeks during the summer, whereof two of the weeks shall be consecutive. Summer vacations shall be agreed upon within May 1st of every year. In regards to the 2001 summer vacation, the mother shall decide when she wants to have her vacation and thereafter the two parents shall alternately decide their vacations every other year within May 1st.

6.      The parents have further agreed to cooperate loyally for the best for their daughter, ensuring that this agreement and what it confirms can be carried out.  (Emphasis added.)

The term "joint parental responsibility" used in the Agreement has a designated meaning under Norwegian law.  Thus, in addition to access rights, Plaintiff Furnes had additional rights associated with "joint parental responsibility" under Norwegian law.  Specifically, under Norway's Act No. 7 of 8 April 1981 relating to Children and Parents (the "Children Act"), parental responsibility is broadly defined to include the right "to make decisions for the child in personal matters."  Section 30 of the Children Act states:

> **Meaning of parental responsibility**
> The child is entitled to care and consideration from those who have parental responsibility.  <u>These persons have the right</u> and the duty <u>to make decisions for the child in personal matters</u> within the limits set by sections 31 and 33[1].  Parental responsibility shall be exercised on the basis of the child's interests and needs.
> Those who have parental responsibility are under obligation to bring up and maintain the child properly.  They shall ensure that the child receives an education according to his or her ability and aptitude.
> The child must not be subjected to violence or in any way be treated so as to harm or endanger his or her mental or physical health.
> As regards the right to make decisions on behalf of the child in financial matters, the provisions of Act No. 3 of 22 April 1927 on Guardianship shall apply.

---

[1]Sections 31 and 33 relate to the child's rights of self-determination as he or she grows older, such as the rights to state her opinion at age 12 and to make decisions as she "comes of age."  Jessica was not yet five years old when removed from Norway in 2001, and is only seven years old now.  Thus, the limits of those sections are not involved in this case.

Children Act, § 30 (emphasis added). Accordingly, under § 30, a parent with joint "parental responsibility" has the right, albeit a shared right, "to make decisions for the child in personal matters."

Where parents exercise "joint parental responsibility" but the child lives with only one parent, this joint but broad decision-making authority of the other parent granted under § 30 is, however, narrowed by § 35b of the Children Act, as follows:

> **Decisions that may be taken by the person with whom the child lives permanently**
> If the parents have joint parental responsibility, but the child lives permanently with only one of them, the other parent may not object to the parent with whom the child lives <u>making decisions concerning important aspects of the child's care</u>, such as the question of whether the child shall attend a day-care centre, where in Norway the child shall live and other major decisions concerning everyday life.

Id. § 35b (emphasis added). Accordingly, where the parents have "joint parental responsibility," the parent with whom the child resides (in this case, Defendant Reeves) has decision-making authority "concerning important aspects of the child's care," but not all aspects of the child's care. Section 35b of the Children's Act thus does not take away all decision-making authority granted the other parent under § 30. Instead, Plaintiff Furnes still retains some decision-making authority over some aspects of the child's care under § 35(b) and for the child in other personal matters under § 30.

8

In addition, while the parent with whom the child resides has the authority under § 35b to determine where the child will live within Norway, § 43 of the Children Act grants a parent with joint parental responsibility, here Furnes, decision-making authority over whether the child lives outside Norway. Specifically, § 43 provides that both parents must consent to the child moving abroad, as follows:

> **Moving abroad with the child**
> If one of the parents has sole parental responsibility, the other parent may not object to the child moving abroad. <u>If the parents have joint parental responsibility, both of them must consent to the child moving abroad.</u>
> If the parents disagree as to who shall have parental responsibility or with whom the child shall live permanently, the child must not move abroad until the matter has been decided.

<u>Id.</u> § 43 (emphasis added). Consequently, Plaintiff Furnes's joint parental responsibility effectively gave him the right, generally referred to as a "<u>ne exeat</u>" right, to determine whether Jessica can live outside of Norway with her mother.

## C. Removal

During the evidentiary hearing, Plaintiff Furnes introduced a Bergen police report summarizing how the removal of Jessica to the United States occurred and his subsequent efforts to locate his daughter. Furnes also testified about these events. The district court found that Furnes's testimony was credible, that the

9

police report accurately summarized his efforts to locate his daughter, and that Furnes did not acquiesce in the removal of Jessica to the United States.[2]

In May of 2001, Defendant Reeves approached Plaintiff Furnes and requested a modification to the access schedule. She proposed that Jessica stay with Furnes for a longer period than scheduled in May 2001 and in the fall of 2001 in exchange for Furnes's consent to Jessica spending the entire summer in the United States with Reeves. According to Furnes, Reeves explained that her brother was getting married in the United States, and Reeves wanted to take Jessica to spend the summer of 2001 with her family. Furnes agreed, with the clear expectation that Jessica would return to start school in Norway in the Fall of 2001. According to Furnes, Defendant Reeves neither returned nor contacted him to inform him of her whereabouts.

Plaintiff Furnes presented evidence that, when Reeves failed to contact him at the end of the summer 2001, he began ceaseless efforts to locate Defendant Reeves and Jessica, at first in Bergen and Oslo and then in the United States. He first tried calling and writing to Reeves at her home in Bergen, with no response. He then contacted Reeves's landlord, who informed him that she had moved to

---

[2]We note that Defendant Reeves's account of these facts is substantially different from Plaintiff Furnes's, but the district court did not credit her account.

Oslo.  Furnes then contacted the local post office and was informed that Reeves's mail was being forwarded to her sister's address in Oslo.  Later in the fall of 2001, Furnes made numerous telephone calls to Reeves's sister in Oslo, who promised to pass the messages on to Reeves.  When Reeves failed to return any of the calls, Furnes contacted Reeves's sister's husband at his place of business and begged him to tell Plaintiff Furnes where Reeves was, but Reeves's sister's husband denied any knowledge of Reeves's whereabouts.

On March 25, 2002, Plaintiff Furnes filed a police report at the Bergen Police Station, which summarized his above efforts to locate his daughter.  He was ultimately told by Norwegian authorities that Defendant Reeves probably was not in Oslo and that there was little else they could do to locate Reeves or Jessica.  On March 27, 2002, Furnes filed a petition for the return of his daughter with the Norwegian Ministry of Justice, who helped Furnes in his attempts to locate his daughter.  Plaintiff Furnes then began searching for Reeves and Jessica in the United States.  In August 2002, Plaintiff Furnes traveled to Tampa, Florida and Atlanta, Georgia, where he had been informed that Reeves might be living, to search for Reeves and Jessica.

**D.  ICARA Petition**

On November 4, 2002, Plaintiff Furnes filed a Petition for Return of Child to Petitioner under ICARA in the district court in Atlanta, Georgia. Furnes's ICARA petition alleged that Defendant Reeves wrongfully removed Jessica from Norway in violation of Furnes's joint custody rights and sought her return pursuant to Article 12 of the Hague Convention on the Civil Aspects of International Child Abduction[3] (the "Hague Convention" or "Convention") and 42 U.S.C. § 11603(b).

After an evidentiary hearing, the district court concluded that Defendant Reeves's removal of Jessica from Norway violated Plaintiff Furnes's rights to his daughter under Norwegian law. The district court further found (1) that Plaintiff Furnes was a credible witness, (2) that Furnes had not acquiesced in Defendant Reeves's removal of Jessica from Norway, (3) that Furnes had been unable to locate Reeves and Jessica for many months after the removal, and (4) that his ICARA petition had been timely filed within one year of removal, in accordance with the Hague Convention.

The district court, however, concluded that Plaintiff Furnes was exercising mere access rights coupled with a <u>ne exeat</u> right under Norwegian law – not

---

[3]Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, <u>reprinted in</u> 51 Fed.Reg. 10,494 (1986). For an overview of the structure and implementation of the Hague Convention and a list of many law review articles about the Hague Convention, <u>see</u> Linda Silberman, <u>Hague International Child Abduction Convention: A Progress Report</u>, 57 Law & Contemp. Probs. 209 (1994).

custody rights – over Jessica at the time of removal. On that basis, the district court decided that it was not authorized to order the return of the child pursuant to the Convention and ICARA, and denied the petition.

On March 7, 2003, Plaintiff Furnes sought a clarification of his rights from the Bergen City Recorder on an ex parte basis.[4] On March 11, 2003, the Bergen City Recorder issued a ruling discussing § 30 and § 35b of the Norwegian Children Act and clarifying that Defendant Reeves's emigration with her daughter violated Furnes's "right of codetermination with regard to the child," as follows:

> The legal point of departure is that, pursuant to the settlement in court of February 28 2001, the parties shall have joint legal custody of the child. That entails that, pursuant to section 30 of the Norwegian Children Act, the parties shall jointly make all of the necessary decisions about the child's circumstances, in which the child herself is unable to take part because of her maturity, etc. According to an express provision of section 43, paragraph 1 of the Children Act, both parties must agree before the child can emigrate from Norway.
>
> According to the settlement in court, the defendant, Pamela Kay Reeves, shall have the daily care and control of the parties' joint child. Pursuant to section 35b of the Children Act, this entails the authority to make decisions about the child's daily circumstances, including moving within the borders of Norway. This authority does not include emigrating abroad with the child.
>
> According to the documents of the case, the court presumes that Pamela Kay Reeves did not ask for the plaintiff's consent before she emigrated with the child to the USA in 2001. The emigration with the

---

[4]This ruling was entered by the Bergen City "Recorder," which the parties advise us is a judge on the Bergen City court.

child was thereby in violation of [Tom] A. Furnes's right of codetermination with regard to the child.

This ruling indicated that, pursuant to § 30, Furnes and Reeves "shall jointly make all of the necessary decisions about the child's circumstances," and that pursuant to § 35b, Reeves had "the authority to make decisions about the child's daily circumstances, including moving within the borders of Norway," but not to emigrate abroad with the child.

Plaintiff Furnes then filed a motion for reconsideration with the federal district court on the basis of the Bergen City Recorder's ruling. The district court denied the motion.

## II. STANDARD OF REVIEW

"We review the district court's factual findings for clear error and its legal conclusions de novo." Lops v. Lops, 140 F.3d 927, 935 n.6 (11th Cir. 1998) (citation omitted).

## III. DISCUSSION

Plaintiff Furnes seeks return of his daughter to Norway pursuant to the Hague Convention, as adopted in the United States in ICARA. See 42 U.S.C. §§ 11601-11611. The paramount issue in this case is whether Plaintiff Furnes's rights to his daughter under Norwegian law are the type of rights that entitle him to

14

the return of his child under the express terms of the Hague Convention. We conclude that they are.

In so doing, we first review the terms and purposes of the Hague Convention. We then analyze the extent and nature of Plaintiff Furnes's Norwegian law rights, place them in the framework of the Hague Convention's terms, and explain why Plaintiff Furnes is entitled to return of Jessica to Norway. Finally, we address Defendant Reeves's two affirmative defenses.

## A. Purpose of the Hague Convention

The Hague Convention was created in 1980 with the stated purpose "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Convention, intro. The Hague Convention specifies that its objects are: "a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Convention, Art. 1.

To effect these general goals, Articles 3, 5, 12, and 13 of the Hague Convention together establish the remedy of return of a child to his or her country

of habitual residence and set forth the circumstances under which the return remedy is available. Convention, Arts. 3, 5, 12, 13. The Convention is designed to restore the pre-abduction status quo and to deter parents from crossing international borders in search of a more sympathetic forum. Lops, 140 F.3d at 936 (citing Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996)).

**B. Hague Convention's Return Remedy**

Article 12 of the Hague Convention establishes the general rule that a child who has been "wrongfully removed or retained" within the meaning of the Convention shall be returned <u>unless</u> more than a year has elapsed between the removal and the date of commencement of the proceedings <u>and</u> the child has become settled. Convention, Art. 12; <u>see</u> 42 U.S.C. § 11601.[5]

Article 3 of the Hague Convention outlines the conduct that is "wrongful" for purposes of Article 12. Pursuant to Article 3, the removal or retention of a

---

[5]In this regard, Article 12 provides in relevant part:

Where a child has been <u>wrongfully removed or retained in terms of Article 3</u> and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a <u>period of less than one year</u> has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

The judicial or administrative authority, even where the proceedings have been commenced after the expiration of one year referred to in the preceding paragraph, shall also order the return of the child, <u>unless it is demonstrated that the child is now settled</u> in its new environment.

Convention, Art. 12 (emphasis added).

child is wrongful if it violates the "rights of custody" of another person, either jointly or alone, and those "rights of custody" were actually being exercised at the time of the removal or retention or would have been exercised absent the removal or retention. Convention, Art. 3. Article 3 provides:

> The removal or the retention of a child is to be considered wrongful where –
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Id. (emphasis added); see Lops, 140 F.3d at 935.

The Hague Convention does not include an exhaustive list of rights that constitute "rights of custody." However, Article 5 does distinguish between "rights of custody" and "rights of access" as follows:

> a) "rights of custody" shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;
> b) "rights of access" shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

Convention, Art. 5 (emphasis added). Accordingly, "rights of custody" is a term expressly defined in the Convention. In American courts, we tend to think of custody rights primarily in the sense of physical custody of the child. However, in

17

applying the Hague Convention, we must look to the definition of "rights of custody" set forth in the Convention and not allow our somewhat different American concepts of custody to cloud our application of the Convention's terms. Specifically, in this case we must think of "rights of custody" as including "rights relating to the care of the person of the child," and in particular, "the right to determine the child's place of residence." Id.

Further, Article 13 of the Convention sets forth certain narrow exceptions to Article 12's mandatory-return rule. Under Article 13, a court is not bound to order the child's return if the person opposing the return establishes that "the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention . . . ." Convention, Article 13(a).[6]

In sum, the Hague Convention provides that the removal or detention of a child from his or her State of habitual residence is wrongful if the petitioner establishes by a preponderance of the evidence that: (1) the child has been removed or retained in violation of the petitioner's "rights of custody," i.e., "rights relating

---

[6]Article 13 provides for certain other narrow exceptions to the mandatory-return rule, none of which is implicated here.

to the care of the person of the child and, in particular, the right to determine the child's place of residence," either jointly or alone; and (2) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."  Convention, Arts. 3, 5; 42 U.S.C. § 11603(e)(1)(A); see Lops, 140 F.3d at 936.[7]  Once the petitioner satisfies this burden, the child must be returned to her State of habitual residence unless the respondent establishes one of these affirmative defenses: (1) that the petition for return was filed more than one year from the removal or retention and the child is well-settled in her new environment, or (2) that the petitioner "was not actually exercising the custody rights at the time of the removal or retention, or had consented to or subsequently acquiesced in the removal or retention."  Convention, Arts. 12, 13; 42 U.S.C. § 11603(e)(2)(B).[8]

**C.  Furnes's Norwegian Law Rights Under §§ 30 and 35b**

---

[7]"The rights of custody . . . may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."  Convention, Art. 3.

[8]There are two other available affirmative defenses to the respondent that are not at issue in this case.  Return is not required if the respondent establishes by clear and convincing evidence that (1) "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," Convention, Art. 13(b); or (2) the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," id. Art. 20. 42 U.S.C. § 11603(e)(2)(A).  See infra note 19; see also Ostevoll v. Ostevoll, 2000 WL 1611123 at 11 (S.D. Ohio 2000).

19

The paramount issue in this case is whether Plaintiff Furnes's rights to his daughter under Norwegian law are "rights of custody," as defined under the Hague Convention. The parties agree that Jessica was a habitual resident of Norway from her birth in 1996 until immediately before her removal in 2001, and that Plaintiff Furnes had certain parental rights with regard to Jessica. However, they dispute whether Furnes's rights under Norwegian law, either individually or together, are "rights of custody," as defined under the Hague Convention. The Convention defines "rights of custody" to include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, Art. 5(a). Thus, the question becomes whether Furnes's rights under Norwegian law are "rights relating to the care of the person of the child."[9]

The Agreement provided that Furnes shall have "joint parental responsibility" over Jessica, and the Norwegian Children Act provides what parental rights are conferred by "joint parental responsibility." However, the parties dispute the proper characterization of the rights attendant to "joint parental responsibility" under Norwegian law. Plaintiff Furnes argues that § 30 and § 43 of

---

[9]Plaintiff Furnes had visitation or access rights under the Agreement. The parties agree that the Convention distinguishes between "rights of custody" and "rights of access" and provides the return remedy only for violations of rights of custody. Accordingly, Plaintiff Furnes's rights of access, although valuable, do not help him here.

20

the Children Act provide him with rights of custody as defined by the Convention. We address each section.

Section 30 of the Norwegian Children Act establishes general rights and duties of a person who has parental responsibility, including "the right and the duty to make decisions for the child in personal matters." Children Act, § 30 (emphasis added). The Norwegian Children Act does not define further "decisions for the child in personal matters." We believe that the right "to make decisions for the child in personal matters" necessarily embraces a broad range of personal decisions, such as decisions regarding the personal care, protection, maintenance, and finances of the child. Further, the child's care would include everyday decisions about the child's shelter, food, clothing, education, and medical needs. However, this broad decision-making power granted persons with parental responsibility is limited by § 35b, which provides:

> If the parents have joint parental responsibility, but the child lives permanently with only one of them, the other parent may not object to the parent with whom the child lives making decisions concerning important aspects of the child's care, such as the question of whether the child shall attend a day-care centre, where in Norway the child shall live and other major decisions concerning everyday life.

Children Act, § 35b (emphasis added).[10]  Section 35b's provision that Plaintiff Furnes cannot object to Defendant Reeves making decisions concerning "important aspects of the child's care" clearly subsumes a measure of his authority to make "decisions for the child in personal matters" granted under § 30.  The question then is whether any of his § 30 rights survives the application of § 35b.  We believe that they do.

It is a fundamental rule of statutory interpretation that, within an act, the same words have the same meanings and different words have different meanings. See United States v. Gonzales, 520 U.S. 1, 5, 117 S. Ct. 1032, 1035 (1997) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting Russello v. United States, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983)) (internal quotation marks omitted); Iraola & CIA, S.A. v. Kimberly-Clark Corp., 232 F.3d 854, 859 (11th Cir. 2000).  This presumption is no less compelling where the legislation is foreign, as we assume that the same logical principles governing

---

[10]If the realm of "decisions for the child in personal matters" in § 30 (granted parents with joint parental responsibility) did not encompass the care of the child, then there would be no need for § 35b to limit the rights of a parent with joint responsibility in the circumstances where the child lives permanently with one parent with joint parental responsibility.  This furthers our conclusion that the right "to make decisions for the child in personal matters" encompasses decision-making authority over the child's care.

22

Congress also guide the Norwegian legislature. Indeed, no party in this case has argued otherwise.

Because the language granting authority to Plaintiff Furnes in § 30 differs from the limiting language of § 35, we must presume that the difference is intentional rather than accidental. The Norwegian legislature easily could have specified in § 35b that the other parent could not object to the parent with whom the child lives making "decisions for the child in personal matters." Had the legislature elected to use the language of § 30 in § 35b, it would have entirely negated Furnes's right to make "decisions for the child in personal matters," as his child lives permanently with her mother. Because it did not, we conclude: (1) that the parent with whom the child does not reside retains the joint right to make certain "decisions for the child in personal matters"; (2) that the realm of "decisions for the child in personal matters" in § 30 encompasses the child's care and is broader than and extends beyond those "concerning important aspects of the child's care" in § 35b; (3) that Furnes is therefore empowered by § 30 to make some decisions that affect personal matters, including some decisions that affect the child's care, but do not concern "important aspects of the child's care"; and (4) that some of those retained "decisions for the child in personal matters" fall within the

23

ambit of decisions relating to the "care of the person of the child" within the meaning of Article 5 of the Convention.[11]

Accordingly, we determine that § 30 alone may well grant Plaintiff Furnes a "right of custody" as defined under the Convention. Our ultimate decision that Plaintiff Furnes has such rights of custody, however, need not, and thus does not, depend wholly on this determination. As explained below, Furnes's <u>ne exeat</u> right under § 43 of the Norwegian Children Act grants Furnes the substantive right (albeit a joint right) to determine whether the child lives within or outside Norway, and thus the right to determine jointly with Reeves the child's place of residence. We conclude that this <u>ne exeat</u> right in § 43, especially in the context of Furnes's retained rights under § 30, constitutes a "right of custody" as defined in the Convention.

## D. Furnes's <u>Ne Exeat</u> Right Under § 43

Section 43 of the Norwegian Children Act provides that if both parents have joint parental responsibility, both of them must consent to the child leaving Norway and living abroad. We conclude that this <u>ne exeat</u> right grants Plaintiff Furnes a

---

[11]Our analysis above is based on our view that "decisions for the child in personal matters" encompass more than just the child's care. However, even assuming that "decisions for the child in personal matters" is the functional equivalent of decisions regarding "aspects of the child's care," we note that § 35b excludes only "important aspects of the child's care," not all aspects of the child's care. Thus, Plaintiff Furnes would retain rights regarding some aspects of the child's care under either interpretation.

right of custody under the Hague Convention. Our conclusion turns on the definition of "rights of custody" in the Convention, but it is further supported by the history and purposes of the Convention and the decisions of courts in our sister signatories.

Article 5 of the Hague Convention defines "rights of custody" to include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, Art. 5. The question, then, is whether the ne exeat right amounts to "the right to determine the child's place of residence." We conclude that it does.

In analyzing whether a parent has custodial rights under the Hague Convention, it is crucial to note that the violation of a single custody right suffices to make removal of a child wrongful. That is, a parent need not have "custody" of the child to be entitled to return of his child under the Convention; rather, he need only have one right of custody. Further, he need not have a sole or even primary right of custody. Article 3 of the Convention specifies that the removal or retention of a child is wrongful if it is in breach of "rights of custody attributed to a person . . . either jointly or alone." Id. Art. 3(a) (emphasis added). Accordingly, if Plaintiff Furnes shares with Defendant Reeves a joint right to determine Jessica's place of residence, he has a right of custody under the Hague Convention.

25

Under Norwegian law, the right to determine the child's place of residence is divided, with different rules governing the decision of <u>where</u> to live <u>within</u> Norway on the one hand and the decision to live <u>outside</u> Norway on the other. Defendant Reeves is entitled to decide <u>where</u> Jessica will live <u>within</u> the borders of Norway and Plaintiff Furnes cannot object. Consequently, Furnes has no authority to decide, for example, whether Jessica will live in the city or the country, in Bergen or Oslo, with her mother alone or with her extended family, so long as Jessica resides <u>within</u> Norway.

Plaintiff Furnes does, however, have the right to decide whether or not Jessica can move outside Norway with her mother, and thereby has the joint right to decide whether Jessica's place of residence will be outside or within Norway.

The Convention does not explicitly define the term "place of residence." In light of the context of the Hague Convention, we believe that the right to determine whether the child lives within or outside Norway constitutes a right to determine the child's place of residence. The Hague Convention was designed to provide a remedy not for whether Jessica should live in Bergen or Oslo within Norway (Reeves's right), but for whether Reeves should be able to take Jessica across international borders. Thus, in our view, the only logical construction of the term "place of residence" in the Convention would necessarily encompass decisions

regarding whether Jessica may live outside of Norway. Therefore, what country a child lives in, as opposed to what city or house within Norway, constitutes a right to determine a child's place of residence under Article 5 of the Convention and thus a right of custody under the Convention. Given that the goal of the Hague Convention is to deter international abduction, we readily interpret the ne exeat right as including the right to determine the child's place of residence because the ne exeat right provides a parent with decision-making authority regarding the child's international relocation.

Moreover, even assuming that the child's "place of residence" narrowly refers to the particular house in which the child lives, Plaintiff Furnes nevertheless shares with Defendant Reeves the right to determine Jessica's place of residence outside of Norway. Plaintiff Furnes enjoys the power not only to deny consent to Jessica's moving abroad, but also the power to grant consent subject to whatever conditions he chooses. For example, Furnes could consent to Jessica's removal from Norway on the condition that he receive greater visitation rights, or that she live in a particular city or near a particular airport, or even on the condition that she live in a particular house in the United States. Thus, although § 43 of the Children Act does not explicitly provide Furnes with the right to determine Jessica's specific place of residence, he effectively has that authority (jointly with Defendant Reeves)

27

where Reeves seeks to remove Jessica from Norway. Furnes's right to determine Jessica's place of residence outside Norway is equal to that of Defendant Reeves. Under these circumstances, we conclude that Norwegian law provides Furnes and Reeves with a joint right to determine Jessica's place of residence.

The fact that Plaintiff Furnes does not share in one aspect of that right (i.e., the right to determine Jessica's place of residence within Norway) does not affect this conclusion. Just as there is no requirement in the Convention that a custody right be exercised exclusively by the parent seeking return, there is no requirement that the right be exercised predominantly by that parent. Plaintiff Furnes maintains under Norwegian law a right to determine the place of Jessica's residence, irrespective of whether he exercises that right to a greater, lesser, or equal extent as does Defendant Reeves.

Further, even if Plaintiff Furnes's ne exeat right is (we believe incorrectly) viewed as a mere "veto right" or limitation on Defendant Reeves's right to determine Jessica's place of residence, we nevertheless believe that the ne exeat right under Norwegian law is a right of custody under the Convention. The right to determine the place of the child's residence is just one example of a custody right under the Hague Convention. More generally, rights of custody include rights "relating to the care of the person of the child." Convention, Art. 5. The ne exeat

28

right under Norwegian law certainly establishes a right, no matter how minimally or expansively that right is defined, to affect the child's place of residence.  As the Convention's definition of "rights of custody" implicitly acknowledges, the determination of the child's place of residence is a crucial aspect of the child's care.  Thus, even assuming <u>arguendo</u> that Plaintiff Furnes does not have the right to <u>determine</u> Jessica's place of residence, he has at the very least a veto right <u>relating to</u> the determination of her place of residence – that is, a right "relating to the care of the person" of Jessica.  Convention, Art. 5.  As such, the <u>ne exeat</u> right in § 43 provides Furnes with a right of custody over Jessica as defined by the Hague Convention.

Finally, Plaintiff Furnes's <u>ne exeat</u> right endows him with significant decision-making authority over the child's care.  By requiring that Jessica remain in Norway, Furnes can ensure that Jessica will speak Norwegian, participate in Norwegian culture, enroll in the Norwegian school system, and have Norwegian friends.  That is, Plaintiff Furnes effectively can decide that Jessica will <u>be Norwegian</u>.  The right to determine a child's language, nationality, and cultural identity is plainly a right "relating to the care of the person of the child" within the meaning of the Convention.

**E.  Stated Purpose of Hague Convention**

29

Our conclusion here is consistent with the history and stated purposes of the Convention. As noted previously, the stated purpose of the Hague Convention is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for their rights of access." Convention, intro. The Convention further states that its objects include ensuring "that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Convention, Art. 1(b).[12]

This Court previously has emphasized that "[t]he Hague Convention is intended to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" Lops, 140 F.3d at 936 (citing Friedrich, 78 F.3d at 1064). In this case, the Convention's purposes are served by ordering return of Jessica to Norway. Plaintiff Furnes and Defendant Reeves

_____

[12]As the report containing the official history and commentary of the Convention states, "the intention [of the Convention] is to protect all the ways in which custody of children can be exercised," and the Convention favors "a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration." Elisa Pérez-Vera, Explanatory Report: Hague Conference on Private International Law, in 3 Acts and Documents of the Fourteenth Session (Child Abduction) 426, 446-47, ¶¶ 71, 67 (1981). These considerations do not allow us to order return of a child simply for violations of access rights, no matter how egregious. They do, however, militate in favor of a rule allowing for the most appropriate and effective means of enforcement of existing rights of custody consistent with the terms of the Hague Convention.

maintain "joint parental responsibility" under Norwegian law. While Defendant Reeves has primary physical custody and more decision-making authority than Furnes, Furnes nonetheless maintains joint parental rights under Norwegian law with regard to the care of his child. Furnes even has the right to determine whether Reeves can move Jessica's residence from Norway to the United States. Under these circumstances, sending the child back to Norway best respects the parties' rights under Norwegian law and the Hague Convention.

A return order effectively maintains the status quo with regard to custody of Jessica. A return order will not effect a change in custody (as Defendant Reeves argues) because she is free to accompany her child back to Norway and retain custody. Indeed, upon return to Norway, Defendant Reeves can seek a change in the Agreement to allow her to move with Jessica to the United States. On the other hand, the denial of Plaintiff Furnes's ICARA petition would allow Defendant Reeves to nullify the Agreement approved by the Norwegian Gulating Court of Appeals and to usurp Furnes's Norwegian law rights to care for his child. The specific purpose of the Hague Convention was to deter and amend the exact type of abduction in this case, not to bless it.

## F. International Cases

The United States Supreme Court has established that in interpreting the language of treaties, "we find the opinions of our sister signatories to be entitled to considerable weight." Air France v. Saks, 470 U.S. 392, 404, 105 S. Ct. 1338, 1345 (1985) (internal quotation marks and citations omitted). Although the decisions of foreign courts are not essential to our analysis, our reasoning and conclusions are in harmony with the majority of the courts of our sister signatories that have addressed this treaty issue.

Specifically, courts in the United Kingdom, Australia, South Africa, and Israel have adopted a broad view of "rights of custody," and ordered return under the Hague Convention where a child is removed in violation of a ne exeat right. Those courts have stressed the need for enforcement of custody orders (including ne exeat clauses), the spirit of the Convention, and the desirability of uniformity in ordering the return of children removed in violation of a ne exeat provision. See C. v. C., 1 W.L.R. 654, 658 (Eng. C.A. 1989) (holding that a ne exeat right provided the father with a measure of control over the child's place of residence sufficient to create a right of custody under the Hague Convention); In the Marriage of: Jose Garcia Resina Appellant/Husband and Muriel Ghislaine Henriette Resina Respondent/Wife, [No. 52] (1991) (Austl. Fam.),¶ 26 (adopting the approach of C.

v. C. based on (1) the desirability of uniformity among common law countries, and (2) its view that return of a child removed in violation of a <u>ne exeat</u> order is the "result which is in conformity with the spirit of the Convention which is to ensure that children who are taken from one country to another wrongfully, in the sense of breach of court orders or understood legal rights, are promptly returned to their country so that their future can properly be determined within that society"); <u>Sonderup v. Tondelli</u>, 2000(1) Constitutional Court of South Africa 1171, ¶ 25 (CC) (holding that the mother, who had custody under a British Colombia order, was effectively entitled to exercise her custody rights only in British Colombia (save an authorized period), and her failure to return the child to British Colombia as required under the order was a breach of the <u>conditions</u> of her custody as well as the father's rights); C.C. (T.A.) 2898/92, <u>Foxman v. Foxman</u> ,1992 (H.C.) (Isr.) (concluding that the term "custodial rights" under the Hague Convention should be broadly construed to include cases in which parental consent is required to remove a child from the country of residence).

The English Court of Appeal has also suggested that under some circumstances a court entering the custody order in the child's country of habitual residence may itself have custody rights that are violated by the removal of the child without the court's consent. <u>B. v. B.</u>, 3 W.L.R. 865 (Eng. C.A. 1993). All

E.R. 144 (C.A.) (Eng.) (noting that under Article 3 an "institution or other body" may hold custody rights, and determining that removal of the child from a court's jurisdiction could violate the court's custody rights).

We acknowledge that foreign courts have not unanimously agreed with our decision here. Canadian and French courts have taken the opposite position, concluding that removal of a child in violation of a ne exeat right does not constitute wrongful removal under the Hague Convention. However, the decisions of the English, Australian, South African, and Israeli courts cited above resonate more richly than those of the French and Canadian courts, due to their more persuasive reasoning as well as their stronger numbers. Indeed, the Canadian Supreme Court's suggestion on two occasions that a ne exeat right falls short of a custody right has been dicta both times. Thomson v. Thomson, [1994] 3 S.C.R. 551 (Can.) (ordering return of a child based on violation of a ne exeat clause in an interim custody order to preserve jurisdiction in the Scottish court for a final determination, but noting in dicta that the return remedy would be unavailable in the context of a final order because the purpose of such an order was simply to protect access rights); D.S. v. V.W. [1996] 2 S.C.R. 108 (Can.) (holding that a return remedy was not available for violation of an implicit removal restriction, and stating in dicta that such a violation would concern only access rights, not custody

34

rights). At least one French court has refused to order return of children to the United Kingdom because it viewed the custody order requiring that the mother raise her children in England and Wales as an impermissible restriction on the mother's right to expatriate. T.G.I. Periguex, Mar. 17, 1992, <u>Ministere Public v. Mme. Y.</u>, D.S. Jur. 1992 (Fr.). We view as misguided the French court's focus on the mother's right to expatriate rather than the issues of custody set forth in the Hague Convention.[13]

**G. Other Circuits**

Our conclusion today diverges from those of the Second, Fourth, and Ninth Circuits. The seminal United States Circuit Court case on the issue is <u>Croll v. Croll</u>, 229 F.3d 133 (2d Cir. 2000). The Fourth and Ninth Circuits essentially adopted the <u>Croll</u> majority's reasoning, as did the district court in this case. <u>See Fawcett v. McRoberts</u>, 326 F.3d 491, 500 (4th Cir. 2003), <u>cert. denied</u> 124 S.Ct.

---

[13]We note that the French court's decision has been correctly criticized by the dissent in the Second Circuit case of <u>Croll v. Croll</u>, 229 F.3d 133 (2d Cir. 2000). As noted by the <u>Croll</u> dissent,

> [D]eciding a Hague Convention case on the ground that the custodial parent must remain free to expatriate her child begs the crucial interpretative question of who, for purposes of the Convention, are 'custodial parents' in the first place. Nothing in the Convention suggests that one parent's right to expatriate overrides another parent's rights of custody. On the contrary, the paramount importance the Convention places on custodial rights suggests that where custodial rights and expatriation rights conflict, the latter must yield to the former.

<u>Id.</u> at 152 (Sotomayor, J., dissenting).

805 (2003); <u>Gonzalez v. Gutierrez</u>, 311 F.3d 942, 954 (9th Cir. 2002).  We, however, join the powerful <u>Croll</u> dissent in disagreeing with the majority's conclusions.[14]  We first review the facts in <u>Croll</u>.

In <u>Croll</u>, Mrs. Croll removed her daughter Christina from Hong Kong to the United States in violation of her custody agreement with Mr. Croll.  <u>Croll</u>, 229 F.3d at 135.  Mr. Croll filed an ICARA petition seeking Christina's return to Hong Kong.  <u>Id</u>.  Under their agreement, Mrs. Croll maintained sole "custody, care, and control" of Christina, and Mr. Croll had a right of "reasonable access."  <u>Id</u>.  The agreement also provided that Christina "not be removed from Hong Kong until she attains the age of 18 years" without leave of court or consent of the other parent.  <u>Id</u>.  The district court concluded that this <u>ne exeat</u> clause created rights of custody under the Convention and granted Mr. Croll's petition.  <u>Id.</u> at 136.

In reversing, the <u>Croll</u> majority relied on three main conclusions: (1) that Mr. Croll's <u>ne exeat</u> right is not a right to determine the child's place of residence, but only a limitation on Mrs. Croll's right to determine the child's place of residence; (2) that his <u>ne exeat</u> right could not be exercised absent removal; and (3) that the history and drafters' intent of the Hague Convention supported the view that a <u>ne</u>

---

[14]At least one state court has determined, as we do, that custody rights are created by <u>ne exeat</u> clauses.  <u>See</u> <u>Janakakis-Kostun v. Janakakis</u>, 6 S.W.3d 843 (Ky. Ct. App. 1999), <u>cert. denied</u>, 531 U.S. 811 (2000).

exeat right is not custodial. Id. at 137-143. Our case involves Norwegian law and is different from Croll because Plaintiff Furnes's ne exeat right must be considered in the context of his additional decision-making rights by virtue of his joint "parental responsibility" under Norwegian law. In any event, we believe the Croll majority's analysis of the ne exeat right is flawed for several reasons.

1. Ne Exeat Right Is Not A Mere Limitation

In reaching its view that the ne exeat right was only a limitation, the Croll majority relied in part on how the particular agreement in Croll gave Mrs. Croll the sole "custody, care, and control" of the child, and thus the sole right to determine Christina's place of residence within Hong Kong. Id. at 139-40. However, the Convention specifically provides that a custody right may be exercised either jointly or alone.

In this case, it is clear that Plaintiff Furnes did not have the right to determine alone the place of Jessica's residence. However, neither did Defendant Reeves. Rather, Furnes and Reeves each possessed elements of that place-of-residence right, which they exercised jointly. This fact is unchanged by the Croll majority's naked characterization of a ne exeat right as a "limitation" on the right of the sole custodial parent rather than an independent right of the otherwise non-custodial parent. Indeed, we could also characterize Defendant Reeves's right to

37

determine the precise location of Jessica's residence within Norway as a mere "limitation" (albeit a more expansive one) on Plaintiff Furnes's right to keep his daughter near him. The more natural characterization, however, is that Defendant Reeves and Plaintiff Furnes share a divided right to determine Jessica's place of residence, and that each of their rights serves as a limitation on the other's. Stated simply, they possess a joint right to determine Jessica's place of residence.[15] Our analysis is also consistent with the concept of "joint parental responsibility" recognized under Norwegian law. In contrast to the agreement in Croll, the Agreement here granted Plaintiff Furnes joint parental responsibility, which under the Norwegian Children Act granted Furnes the right to share decision-making authority with Reeves. See Children Act, §§ 30, 35b, 43.

## 2. A Ne Exeat Right Can Be Exercised Without Wrongful Removal

The Croll majority's conclusion was equally informed by its reasoning that the ne exeat clause did not create a right that Mr. Croll could have exercised absent

_____

[15]As aptly stressed by the Croll dissent,
> The Hague Convention provides a remedy not when a parent moves the child from city to suburb or from home to boarding school, but when he or she transports the child across national borders. In light of this international context, the term "place of residence," as used in the Convention, logically contemplates decisions regarding international relocation. Accordingly, the right to choose the country in which a child lives, like the authority over the child's more specific living arrangements, constitutes a "right to determine the child's place of residence" under Article 5, and thus a "right of custody" under the Convention.

Croll, 229 F.3d at 148 (Sotomayor, J., dissenting).

Christina's removal, as required for return under Article 3 of the Convention. Accordingly, the Croll majority concluded that the rights created by the ne exeat clause could not constitute rights of custody under the Convention. Croll, 229 F.3d at 140.

The problem with the majority's reasoning, in our view, is that it incorrectly assumes that a ne exeat right could be exercised only to prevent a wrongful removal; it ignores the situation in which the custodial parent complies with the ne exeat clause and requests the non-custodial parent's consent to move abroad with the child. Here, for example, if Defendant Reeves had sought Plaintiff Furnes's consent to Jessica's moving abroad – as she was required by Norwegian law to do prior to relocating – Furnes would have had the opportunity to exercise his ne exeat right by granting or withholding consent. Accordingly, the ne exeat right is capable of being exercised in the absence of wrongful removal. Indeed, it is likely that Plaintiff Furnes would have exercised his ne exeat rights in the absence of the wrongful removal.

### 3. Purpose and Drafters' Intent

We also do not share the Croll majority's concern that if a ne exeat clause alone conferred "rights of custody" upon a parent, a court could be compelled to return a child to a parent "who lacks the right or responsibility to give care or to

39

decide who should give it, or even to a parent with access who has been found unfit to have custody." Id. at 141. The custody order in Croll placed all burdens of care and custody on Mrs. Croll, and the Croll majority feared that an order returning Christina to Mr. Croll would effectively transfer custody of Christina to a parent with no corresponding duty to provide for her. Id. The Croll majority stressed that the Convention's goal is to enforce custody rights – not to alter them by ordering return of a child to a non-custodial parent. Id. On that basis, the majority concluded that a rule requiring return for violation of a ne exeat clause would make the Convention unworkable and could not accurately reflect the intent of the drafters. Id. at 140-41.[16]

---

[16]In further support of its conclusion with regard to the drafters' intent, the Croll majority noted that the chair of the Hague Conference Commission that drafted the Convention has written that the right to veto relocation does not amount to the type of custody right contemplated in Article 3, as follows:

> [B]reach of a right simply to give or to withhold consent to changes in a place of residence is not to be construed as a breach of rights of custody in the sense of Article 3. A suggestion that the definition of "abduction" should be widened to cover this case was not pursued.

Id. at 141 (quoting A. E. Anton, The Hague Convention on International Child Abduction, 30 Int'l & Comp. L.Q. 537, 546 (1981)). However, as the Croll dissent correctly noted, the above quote represents the view of Mr. Anton alone and not necessarily the approach of the Convention.

We further point out that the legislative history and legal scholarship are divided and none is authoritative. For example, during the debate on various proposals at the final diplomatic conference on the Convention in October of 1980, the following hypothetical was proposed by Mr. Allan Leal of Canada:

> Custody is given to the mother, but the order provides that the child cannot go out of the jurisdiction without the father's consent. If the mother nevertheless leaves the jurisdiction without such consent, that constitutes wrongful removal.

Silberman, Linda, Patching Up the Abduction Convention: A Call for a New International

We are unpersuaded by this analysis as well.  First, this feared result can be avoided by allowing a parent, such as Mrs. Croll, to return the child to her habitual residence as opposed to relinquishing the child to Mr. Croll for return.  Once back in Hong Kong, Mrs. Croll then could petition the court there to remove the ne exeat restriction in the custody agreement.  Accordingly, our construction of the ne exeat right does not alter the terms of the custody agreement.  Rather, it simply would inconvenience Mrs. Croll as the custodial parent by requiring that she comply with its terms.  The Convention's purpose is to prevent the international abduction of children and is thwarted, not satisfied, by the Croll majority's construction of the ne exeat right.

In any event, the particular fears expressed by the Croll majority – that a child could be returned to a parent with no duty or ability to care for the child – are

---

Protocol and a Suggestion for Amendments to ICARA, 38 Tex. Int'l L.J.41, 46 n.34 (2003) (quoting Hague Conference on Private International Law, Acts and Docu ments, III Actes et Documents de la Quatorzieme Session, Oct. 6-25, 1980, AT 266 (1980)).  Some scholars have cited the above hypothetical and these statements in support of the view that ne exeat rights clearly constitute rights of custody.  The comments of other representatives at the Convention have been cited in further support, as follows:

> Mr. van Boeschoten of the Netherlands noted that under the present terms of the Convention, the abducted child would have to be sent back immediately.  Therefore, Mr. van Boeschoten saw no need to revise the present Article 3 to deal more expansively with rights of access.  Mr. Eekelaar, observer for the Commonwealth Secretariat, also expressed the view that a non-custodial parent with a right to be consulted about relocation would be covered in the present definition under Article 5.

Id.

missing from this case. Plaintiff Furnes has ongoing duties under § 30 of the Children Act, among others, to provide care and consideration to Jessica. Indeed, the Bergen City Court determined that Furnes was better able than Reeves to provide for and care for Jessica. The Croll majority's fears are at best unique to the particular facts in that case and not present here.

Further, the Hague Convention requires return of the child to a parent who possesses a single right of custody – even a joint right – that is violated by the child's removal.[17] The necessary implication of the Convention's terms is that a child may sometimes be returned to a parent who has not previously possessed primary physical custody.[18] We also note that the Convention provides an

---

[17]As the Croll dissent notes,
[T]he majority contends that 'rights of custody,' as used in the Convention, refers to a 'bundle of rights' of which a parent must possess a certain portion in order to be protected by the Convention, and that possession of only one of those rights – in this case, the 'right to determine the child's place of residence' by exercising and leveraging a veto power over the child's international relocation – is insufficient to confer custody on the party possessing that power. . . . The Convention contains no indication that in such an arrangement, a parent must possess some minimum number of rights of custody in order to qualify for protection.
Croll, 229 F.3d at 147 (Sotomayor, J., dissenting).

[18]As pointed out in the Croll dissent,
[T]he majority's characterization of a return remedy for violations of ne exeat rights as unworkable fails to account for the Convention's protection of any number of joint custody arrangements in which the parents trade physical custody or in which one parent possesses physical custody and the other parent contributes to decisions about the child's upbringing. By the majority's reasoning, were the parent with physical custody to remove the child from the country of habitual residence, the court would have no power to return the child, because no adult would be required to care for him or her upon return. Such a conclusion, however, would largely eviscerate the

42

exception to the mandatory-return rule where return would be particularly damaging for any reason, including, presumably, the malfeasance or nonfeasance of the parent seeking return. See Convention, Art. 13(b). Article 13(b) provides that a court is not bound to order return of a child where "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."[19] Id. Thus, the Croll majority's concern is already taken into account by Article 13(b) of the Hague Convention. There is no need to diminish the nature of the ne exeat right.

## H. Rights That Were Actually Exercised Or Would Have Been Exercised

Having determined that Plaintiff Furnes has "rights of custody" under the Hague Convention, we now examine whether Plaintiff Furnes has shown that his rights were "actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Convention, Art. 3(b). We conclude that he has.

With regard to Plaintiff Furnes's rights under § 30 of the Children Act, the district court found that Furnes was exercising his rights of joint parental

_____

Convention's protection of joint custody rights.
Id. at 149 (Sotomayor, J., dissenting).

[19]Defendant Reeves does not assert that there is a grave risk that Jessica's return to Norway would expose her to physical or psychological harm or otherwise place her in an intolerable situation. See supra note 8.

responsibility in Norway prior to Jessica's removal to the United States. No indication in the record suggests otherwise. On appeal, Defendant Reeves does not assert that Plaintiff Furnes was not actually exercising his rights at the time of Jessica's removal from Norway.

Further, it is clear that Plaintiff Furnes would have exercised his custody rights under the ne exeat clause in § 43 but for Jessica's removal. Under Norwegian law, Defendant Reeves was bound to seek Plaintiff Furnes's consent prior to relocating outside Norway with Jessica. Had Reeves complied with that obligation, Furnes would have exercised his right by either consenting to the relocation (with or without conditions) or withholding consent. Accordingly, we conclude that Furnes would have exercised his rights under the ne exeat clause but for the removal, as required by Article 3(b) of the Convention. We now turn to Reeves's two affirmative defenses.

**I. One-Year Limitation Period**

Reeves asserts that Plaintiff Furnes's petition was not timely filed because it was filed more than a year following Jessica's removal from Norway. See Convention, Art. 12; 42 U.S.C. § 11603(e)(2)(B). The district court, however, did not err in concluding that Plaintiff Furnes's petition was timely filed. Under Article 12 of the Convention, a court is required to order return of a child who has

44

been wrongfully removed unless the respondent shows that the petition for return of the child was filed more than one year from the date of the wrongful removal or retention. Convention, Art. 12. Even if the petition has been filed more than one year after the abduction, a court is required to order return unless the respondent also shows that the child has become settled in his or her new environment.[20] Id.

Here, Plaintiff Furnes filed his petition more than one year after Jessica's removal. Reeves moved to the United States with Jessica in the summer of 2001, and Furnes did not file the petition until November of 2002. However, the district court concluded that the limitation period was equitably tolled until Plaintiff Furnes located Jessica, and determined that the petition was filed within one year of Furnes's locating Jessica. Accordingly, the district court concluded that the petition was timely filed.

We agree with the district court that equitable tolling may apply to ICARA petitions for the return of a child where the parent removing the child has secreted the child from the parent seeking return. See Mendez Lynch v. Mendez Lynch, 220 F. Supp.2d 1347,1362-63 (M.D.Fla. 2002) (holding that equitable tolling applied to ICARA petitions because otherwise "a parent who abducts and conceals children

---

[20]Because the district court concluded that Furnes's petition was timely filed, the district court did not address the issue of whether Jessica was settled in her new environment.

for more than one year will be rewarded for the misconduct by creating eligibility for an affirmative defense not otherwise available"); see also Ellis v. General Motors Acceptance Corp., 160 F.3d 703, 706 (11th Cir. 1998) ("Unless Congress states otherwise, equitable tolling should be read into every federal statute of limitations."); Young v. United States, 535 U.S. 43, 122 S. Ct. 1036, 1040 (2002) ("It is hornbook law that limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute.") (citations and internal quotation marks omitted). Accordingly, we conclude that the one-year period of limitations began from the date that Plaintiff Furnes confirmed Jessica's location in the United States, in March 2002 at the earliest. See Bocquet v. Ouzid, 225 F.Supp.2d 1337, 1348 (S.D. Fla. 2002) (concluding in ICARA case that one-year limitation period did not begin until date petitioner confirmed the child's residence in the United States).

We also conclude that the district court did not err in applying equitable tolling given the facts found by the district court in this case. For example, the district court accepted Plaintiff Furnes's testimony regarding Defendant Reeves's concealment of her location and his extensive efforts to locate Jessica. The district court found that Furnes was a "credible and believable witness" and that the police report filed by Furnes accurately summarized his efforts to locate his daughter.

The district court's factual findings are not clearly erroneous.[21]  See Lops, 140 F.3d at 935 n.6.

## J.  Consent or Acquiescence

As her second affirmative defense, Reeves contends that Furnes "consented to or subsequently acquiesced" in Jessica's removal from Norway.  Convention, Art. 13(a); 42 U.S.C. § 11603(e)(2)(B).  The district court also did not clearly err in its factual finding that Plaintiff Furnes did not acquiesce in Jessica's relocation. The district court accepted Plaintiff Furnes's testimony that he took repeated and extensive actions to locate his daughter.  As noted by the district court, "[t]he efforts that [Furnes] undertook to obtain legal assistance in Norway . . . are completely inconsistent with any claim of acquiescence in the child being detained permanently in the United States."

---

[21]We recognize that Reeves argues that she disclosed her and Jessica's whereabouts, but the district court accepted Furnes's version of the facts, not hers.  We will not disturb the district court's credibility determinations.  See, e.g., United States v. McPhee, 336 F.3d 1269, 1275 (11th Cir. 2003) ("[W]e allot substantial deference to the factfinder, in this case, the district court, in reaching credibility determinations with respect to witness testimony" (internal quotation marks and citations omitted)).

## IV. CONCLUSION

We conclude that Jessica was wrongfully removed or retained from Norway by Defendant Reeves in violation of Plaintiff Furnes's rights of custody under the Hague Convention; that Furnes was exercising those rights or would have exercised them but for the removal or retention of Jessica; that Furnes's ICARA petition for return of Jessica was timely filed; that Furnes did not consent to or acquiesce in Jessica's removal or retention in the United States; and that the district court erred in denying Furnes's petition for the return of Jessica to Norway.

For the foregoing reasons, we reverse the district court's denial of Plaintiff Furnes's ICARA petition and remand this case with instructions. On remand, the district court shall grant Plaintiff Furnes's ICARA petition, and order that Defendant Reeves shall transport and return Jessica to Bergen, Norway no later than 30 days following the issuance of the mandate of this Court. If Defendant Reeves refuses to comply with the order, then Defendant Reeves shall relinquish Jessica to Plaintiff Furnes at a time and at a location in the United States Courthouse for the Northern District of Georgia, Atlanta, Georgia, to be determined by the district court or at such other place as determined by the district court, and Plaintiff Furnes may then transport and return Jessica to Bergen, Norway. Once Jessica is returned to Bergen, Norway, the parties' rights are governed under their

Agreement and Norwegian law. On remand, the district court shall promptly enter a briefing schedule regarding the award of attorney's fees and costs to Plaintiff Furnes. 42 U.S.C. § 11607. We conclude the district court in the first instance should determine the amount of attorney's fees and costs.

**REVERSED AND REMANDED.**