**In re the Application of Felipe Jara GARCIA, Plaintiff/Petitioner,**

**v.**

**Yanine Hernandez VARONA, Defendant/Respondent.**

1:11–cv–2489–WSD.

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 29, 2011.

Adria Lourdes Perez, Joel D. Bush, II, Melinda Cole Pillow, Kilpatrick Townsend & Stockton, LLP, Atlanta, GA, for Plaintiffs.

Jesus A. Nerio, Office of Jesus A. Nerio, Atlanta, GA, Thomas C. Rowsey, Law Office of Thomas C. Rowsey, P.C., Roswell, GA, for Defendant.

### *OPINION AND ORDER*

WILLIAM S. DUFFEY, JR., District Judge.

This matter is before the Court on Felipe Jara Garcia's ("Petitioner") Verified Complaint and Petition for Return of the Children [1]. This Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I. BACKGROUND

This is a petition filed under the under the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") and the International Child Abduction Remedies Act of 1988 ("ICARA"), 42 U.S.C. § 11601, *et seq.*

Petitioner and Yanine Hernandez Varona ("Respondent") are the unmarried parents of two children, A.J.H. and F.J.H. (the "Children").[1] (Ex. P to Pet'r's V. Compl.; Resp't's Resp. to Pet'r's V. Compl. ¶¶ 1, 6, 23; Ex. A to Pet'r's Mem. ¶¶ 3–4; Tr. of Trial 9:7–8).[2] Petitioner is a

---

1. To protect the privacy of the Children, only their initials and year of birth shall be used in referring to them. Fed.R.Civ.P. 5.2(a)(3).

2. Nine exhibits were offered by Petitioner and admitted at trial on August 25, 2011, to include the birth certificates of the Children, legal documents from Spanish and Georgian

Spanish national. (Ex. P to Pet'r's V. Compl.; Ex. A to Pet'r's Mem. ¶ 2). Respondent is a Cuban national, who possesses a Spanish residency card. (Ex. P to Pet'r's V. Compl.; Tr. of Trial 49:10–15). A.J.H. was born in 2004. (Pet'r's V. Compl. ¶ 7; Ex. P to Pet'r's V. Compl.; Resp't's Resp. to Pet'r's V. Compl. ¶¶ 1, 6; Tr. of Trial 50:1). F.J.H. was born in 2006. (Pet'r's V. Compl. ¶ 8; Ex. P to Pet'r's V. Compl.; Tr. of Trial 50:2). Both were born in Seville, Spain and are Spanish nationals. (Ex. P to Pet'r's V. Compl.; Tr. of Trial 50:4). Petitioner is the biological father of both children. (Exs. H–L, P to Pet'r's V. Compl.; Resp't's Resp. to Pet'r's V. Compl. ¶¶ 1, 6, 23; Ex. A to Pet'r's Mem. ¶ 3; Tr. of Trial 49:20).

From April 2004 until separating in April 2010, Petitioner and Respondent lived together with the Children in Seville, Spain. (Pet'r's V. Compl. ¶¶ 9, 11; Ex. P to Pet'r's V. Compl.; Resp't's Resp. to Pet'r's V. Compl. ¶¶ 1, 4, 6, 9; Ex. A to Pet'r's Mem. ¶ 4; Tr. of Trial 50:12).[3] Petitioner moved out of the family home in April 2010 because the situation between he and Respondent became intolerable and he had concluded that moving to his mother's house was best for the Children. (Tr. of Trial 10:21–23).

Between April 2010 and the removal of the Children from Spain in December 2011, the Children resided principally with Respondent. (Pet'r's V. Compl. ¶ 11; Resp't's Resp. to Pet'r's V. Compl. ¶ 11). During this period, Petitioner visited the Children every Tuesday and Thursday and the Children lived with him every other weekend. (Pet'r's V. Compl. ¶ 11; Resp't's Resp. to Pet'r's V. Compl. ¶ 11; Ex. A to Pet'r's Mem. Concerning the Pet'r's Rights of Custody ("Pet'r's Mem.") ¶¶ 6–7; Tr. of Trial 11:6–8). Petitioner also provided 400 Euros a month to Respondent for the support of the Children; paid for A.J.H's English classes; and paid the mortgage and a portion of the utility bills for the home in which Respondent and the Children were living. (Ex. A to Pet'r's Mem. ¶¶ 8–10; Tr. of Trial 11:9–13).[4]

In July 2010, Respondent visited Florida with the Children to vacation with her maternal relatives there. (Tr. of Trial 53:8–14). Petitioner supported the visit to Respondent's family. (Tr. of Trial 54:1–6). While driving back from the airport following the vacation to Florida, Respondent claims she told Petitioner that her and the Children's future was in the United States, and she claims Petitioner said she could live where she wanted. (Resp't's Resp. to Pet'r's V. Compl. ¶ 27; Tr. of Trial 59:13–25). Petitioner denies that he ever gave consent to allow Respondent to remove the Children to the United States if she chose to reside there. (Tr. of Trial 20:5–6).

On September 10, 2010, Petitioner and his Spanish attorney met with Respondent about reaching a formal agreement re-

---

courts, a letter from Respondent, and documents submitted to the Spanish Central Authority. The Court notes that all of the exhibits were previously submitted to the Court in pleadings from the parties. (Exs. D–E, H–J, M–N, P to Pet'r's V. Compl.; Ex. 1 to Pet'r's Notice of Filing).

**3.** Respondent has characterized the separation as an abandonment of her and the Children by Petitioner. (Resp't's Resp. to Pet'r's V. Compl. ¶ 28; Resp't's Resp. to Pet'r's Mem. at 2, 9).

**4.** Respondent claimed at trial that her recollection was that Petitioner only paid for English lessons once and that the monetary support did not begin until September 2010. (Tr. of Trial 58:11–59:4). Having heard testimony from the Petitioner and reviewed his declaration, the Court finds his accounting of support to be more convincing and credible and adopts it. (Ex. A to Pet'r's Mem. ¶¶ 8–10; Tr. of Trial 11:9–13).

garding their relationship and the custody of the Children. (Ex. A to Pet'r's Mem. ¶ 11; Resp't's Resp. to Pet'r's Mem. at 3; Tr. of Trial 11:15–17, 57:8–19). Petitioner, with his attorney, proposed to Respondent the terms of their separation, but Respondent declined to enter any agreement because she disagreed with the level of financial support. (Ex. A to Pet'r's Mem. ¶¶ 11–12; Tr. of Trial 11:15–17, 57:8–19). Prior to and after this meeting Petitioner regularly sought to spend time with the Children and indicated to Respondent that he would resort to the Spanish courts to enforce his rights if she refused to allow him to be with the Children. (Tr. of Trial 52:4–53:5).

Believing that Respondent may remove the Children from Spain without telling him, on September 24, 2010, Petitioner initiated a proceeding in Spain to establish "provisional measures" regarding his parental rights. (Pet'r's V. Compl. ¶ 12; Ex. G to Pet'r's V. Compl. ("Navarro Legal Opinion"); Ex. A to Pet'r's Mem. ¶ 12; Pet'r's Notice of Filing at 1; Tr. of Trial 13:23–25). Petitioner filed a Petition for Immediate and Emergency Preliminary Measures ("Emergency Petition") with the Court of First Instance and Preliminary Investigation Number 4 of San Lucar La Mayor, Seville, Spain (the "Spanish Court"). (Ex. 1 to Pet'r's Notice of Filing; Tr. of Trial 13:23–25). The Emergency Petition was Petitioner's attempt

"to exercise [his] rights as a parent and those of the [Children]" after Respondent threatened "to leave the country with the [C]hildren and take them away from the [P]etitioner...." (Ex. 1 to Pet'r's Notice of Filing). In the Emergency Petition, Petitioner sought provisional measures to define joint parental decision-making rules, visitation, support, and the circumstances under which Respondent could depart the country with the Children. (*Id.*).

Within a week of initiating the proceeding in Spain for provisional measures, Petitioner met with Respondent and told her he had filed the legal action. (Ex. A to Pet'r's Mem. ¶ 13; Tr. of Trial 15:18–20).

On November 24, 2010, the Spanish Court issued its preliminary order regarding the Emergency Petition. (Ex. H to Pet'r's V. Compl.). The Spanish Court considered Petitioner's request for "provisional measures," "accepted that the couple have children who are minors," and required Petitioner and Respondent to appear at a hearing on December 15, 2010.(*Id.*). During November 2010, Petitioner told Respondent[5] that a hearing had been scheduled by the Spanish Court to be conducted on December 15, 2010, at which the Court would consider his petition for provisional measures. (Ex. A to Pet'r's Mem. ¶ 15; Tr. of Trial 17:24–18:12).[6] The summons and complaint filed

---

**5.** Petitioner testified this occurred when he was either picking up or dropping off the Children at the home where Respondent was staying with the Children. (Tr. of Trial 18:5–12).

**6.** Petitioner states that he told her of the hearing in mid-November 2010 after learning of the date from a friend who worked at the Spanish Court. (Ex. A to Pet'r's Mem. ¶ 15; Tr. of Trial 17:24–18:4). Respondent states that this could not have occurred since the Spanish Court did not issue its order until November 24, 2010. (Resp't's Resp. to Pet'r's

Mem. at 3). Respondent initially and continues to deny ever being told of any complaint being filed prior to removing the Children. (Resp't's Resp. to Pet'r's V. Compl. ¶ 15; Resp't's Resp. to Pet'r's Mem. at 3; Tr. of Trial 55:25–56:2, 60:16–18). Having reviewed the evidence and heard from the parties, the Court finds that he verbally informed her in September about the Emergency Petition and notified her in mid-November of the December 15, 2010, hearing date after learning of it from a friend who worked at the Spanish Court.

in the Spanish Court apparently was not served upon Respondent before she departed Spain. (Resp't's Resp. to Pet'r's V. Compl. ¶ 15).

On November 30, 2010, Petitioner went to the Children's school and learned they were absent. (Tr. of Trial 18:15–17). Distressed about the location of Respondent and the well-being of the Children, Petitioner began a search to find the Children, and ultimately learned from Respondent's relatives in Spain that she had departed Seville, taking the Children with her that morning. (*Id.* at 18:18–22).

After Petitioner learned Respondent and the Children were no longer in Seville, the parties had a telephone conversation on the evening of November 30, 2010. (*Id.* at 26:13–21, 60:10–18).[7] In the November 30, 2010, telephone conversation, Respondent did not disclose to Petitioner her plans to depart Spain the next day for the United States and to take the Children with her. (*Id.* at 26:13–21, 61:8–9).

On or about December 9, 2010, just days before the December 15, 2010, hearing,

Respondent informed Petitioner by phone and by a letter sent by facsimile that she had moved to the United States with the Children. (Pet'r's V. Compl. ¶¶ 15–16; Exs. G, I to Pet'r's V. Compl.; Resp't's Resp. to Pet'r's V. Compl. ¶ 16; Tr. of Trial 18:24–19:5).[8] Respondent prepared the letter with the assistance of a Spanish attorney and drafted it just days after arriving in the United States. (Tr. of Trial 63:9–63:22). Without specifically acknowledging that she prepared the letter in contemplation of the ongoing actions in the Spanish Court or some other legal proceeding, Respondent acknowledged she sought legal counsel and had sent the letter to have a record of her communication to Petitioner after arriving in the United States. (*Id.* at 64:9–19).[9]

On December 9, 2010, the Spanish Court, after being advised of the possibility that the Children might be removed from Spain by Respondent without the Petitioner's consent, issued a second order. (Ex. J to Pet'r's V. Compl.). The Spanish Court noted "the possible exit" from Spain of A.J.H. and F.J.H. (*Id.*). The court fur-

7. After trial and the time for the presentation of evidence had closed, Petitioner filed an additional exhibit, a DVD containing portions of a Spanish television show discussing the November 30, 2010, telephone conversation. The Court has neither viewed, nor considered, the DVD in reaching its findings of fact and conclusions of law.

8. Respondent's return address on her letter dated December 2, 2010, indicates she initially moved to Hialeah, Florida. (Ex. I to Pet'r's V. Compl.) During testimony at trial, Respondent stated that she provided the Florida address only as a means for Petitioner to contact her and the Children. (Tr. of Trial 62:11–17). Respondent actually proceeded directly to Atlanta, Georgia, to commence a relationship with Carloo Mauricio Perez Hinojosa, a television correspondent, whom she met in Cuba when she was 15 years old and with whom she reconnected with on Facebook in May 2010. (Ex. P to Pet'r's V.

Compl.; Tr. of Trial 63:5–8). The Court finds that by providing a Florida address to Petitioner, Respondent sought to conceal her true location because she knew her removal of the Children was wrongful, and desired, at least initially, to hide the location of the Children from Petitioner.

9. The Court also notes that a defense to a charge under Spanish criminal law for parental abduction is to show that the parent charged with abduction had sent correspondence to the other parent with the information contained in the letter that Respondent sent and which was dated December 2, 2010. C.C., Art. 225 bis; (Ex. R to Pet'r's V. Compl.). The fact Respondent consulted with an attorney regarding her removal of the Children from Spain and also wrote a letter that could possibly be used to defend herself from criminal charges evidences that Respondent knew her actions at the time were wrongful and in violation of Spanish law.

ther noted that the Children had "stopped going to the school where they were registered, [which] reinforces the possibility that the mother wants to leave the country with the minors." (*Id.*). The court's December 9th order prohibited the departure of A.J.H. and F.J.H. from Spain, prohibited the issuance of passports to the Children, and recalled any passports issued to the Children. (*Id.*).[10] The Spanish Court imposed the removal prohibition "to save, the minors' interests and their rights to relate to their father" as set forth in Article 156 of the Spanish Civil Code. (*Id.*). The Spanish Court stated in its order: "In addition in respect to the article 156 of the Civil Code, Paternal authority will be exercised together by both parents or just by one of them with the other's clear or tacit consent, and in this case there is evidence that the father has expressed his negativity towards leaving the country." (*Id.*).[11]

On December 9, 2010, the Justice Court Number 4 of San Lucar La Mayor, Seville, Spain (the "Spanish Justice Court") issued an indictment against the Respondent for "the possible existence of a penal infringement" regarding the removal of the Children from Spain. (Ex. K to Pet'r's V. Compl.). The Spanish Justice Court scheduled a hearing on February 4, 2011, to consider evidence regarding the possible penal infringement by Respondent. (Ex. L to Pet'r's V. Compl.)[12]

After departing Spain, Respondent took up residence with the Children in Georgia at the residence of Mr. Hinojosa. (Pet'r's V. Compl. ¶ 22; Resp't's Resp. to Pet'r's V. Compl. ¶ 21; Tr. of Trial 62:18–24). In February 2011, she filed, in the Probate Court of Fulton County, a Petition for Temporary Letters of Guardianship of Minor for A.J.H. and a second petition for F.J.H. (Pet'r's V. Compl. ¶ 22; Exs. M–N to Pet'r's V. Compl.; Resp't's Resp. to Pet'r's V. Compl. ¶ 22; Tr. of Trial 22:6–23:18). The petitions sought to have Mr. Hinojosa appointed as temporary guardian. (Pet'r's V. Compl. ¶ 22; Exs. M–N to Pet'r's V. Compl.; Resp't's Resp. to Pet'r's V. Compl. ¶¶ 21, 22, 30; Tr. of Trial 24:19–21).[13] When the temporary guardianship

10. The report filed in this action of Attorney Maria Reyes Gomez Llorente ("Llorente Legal Opinion") by Respondent states that Spanish courts ordinarily issue these sorts of preliminary orders against removal based only on the representations of the petitioning party. In offering this observation, the Llorente Legal Opinion suggests such orders should not be considered as a merits-based finding. The Court here has had the chance to review the Emergency Petition requesting "provisional measures" filed by Petitioner in the Spanish Court and the Spanish Court's November 24, 2010, and December 9, 2010, orders. The information in the Emergency Petition is accurate and the Court concludes the "provisional measures" ordered by the Spanish Court on December 9, 2010, are based on the Spanish Court's opinion that Petitioner has a right to object to the Children's removal from Spain.

11. The Spanish Court apparently did not know Respondent had actually removed the Children to the United States a week earlier.

That fact does not discredit the Court's recognition of Petitioner's parental authority specifically as it relates to his *ne exeat* prerogative to object to the removal of the Children from Spain.

12. It is not entirely clear who reported to the Spanish Justice Court that the Children had been removed from Spain, although Petitioner testified at trial to making a complaint to the local police regarding his wife taking the Children to the United States. (Tr. of Trial 20:10–18). Respondent, who was then already in the United States, did not appear at this hearing. (Resp't's Resp. to Pet'r's V. Compl. ¶ 20).

13. Respondent and the Children are currently living with Mr. Hinojosa. (Resp't's Resp. to Pet'r's V. Compl. ¶¶ 21, 30). Respondent has represented to the Court that she and Mr. Hinojosa are now engaged and he is assisting Respondent in obtaining a work permit to remain in the United States. (Tr. of TRO Hr'g 6:15).

petitions were filed, Petitioner opposed both petitions and, in light of the oppositions, on March 3, 2011, the Probate Court dismissed them pursuant to O.C.G.A. § 29–2–6(d). (Pet'r's V. Compl. ¶¶ 23–24; Exs. N–O to Pet'r's V. Compl.; Resp't's Resp. to Pet'r's V. Compl. ¶ 24; Tr. of Trial 24:25–25:2).

On May 12, 2011, Petitioner filed with the Office of Children's Issues, United States Department of State, an application for the return of the Children. (Ex. P to Pet'r's V. Compl.).

On July 29, 2011, Petitioner filed his Motion Under the Hague Convention for Entry of a Temporary Restraining Order and Scheduling of an Expedited Hearing [2], as well as his Verified Complaint and Petition for Return of the Children [1]. Petitioner sought a temporary restraining order ("TRO") and expedited hearing on his motion for injunctive relief.

A hearing was held by the Court on August 4, 2011, and an order was issued prohibiting the Children from being removed from this jurisdiction and setting an August 25, 2011, date for a trial on the merits. On August 9, 2011, Respondent filed her Response to the Verified Complaint and Petition for Return of the Children [7].

On August 19, 2011, the Court issued a Scheduling Order directing the parties to submit memoranda of law, and, if desired, a response to the other party's submission, regarding whether the removal of the Children was wrongful [8]. The parties submitted their memoranda as directed by the Court [10–14, 16]. A trial on the merits was conducted on August 25, 2011.

## II. DISCUSSION

### A. *Relief under ICARA and the Hague Convention*

The Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott,* —— U.S. ——, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010). As a signatory to the Convention, the United States ensures "its implementation through the International Child Abduction Remedies Act of 1988 (ICARA), 42 U.S.C. § 11603(b)." *Baran v. Beaty,* 526 F.3d 1340, 1344 (11th Cir.2008).

The Convention operates "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *Id.* at 1344 (citing *Hanley v. Roy,* 485 F.3d 641, 644 (11th Cir.2007) (quoting Convention, pmbl.)).[14] ICARA provides a remedy of return to parents whose children are wrongfully removed from their country of habitual residence and brought to the United States. *Id.* The remedy of returning a wrongfully-removed child to their habitual residence is "intended to restore the parties to the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic forum for child custody proceedings." *Id.* In passing ICARA, Congress specifically found that: (1) "The international abduction or wrongful retention of children is harmful to their well-being;" and (2) "Persons should not be permitted to obtain custody of children by virtue of their

---

14. The Convention applies to children under sixteen (16) years of age. Convention, Art. 4. It is not disputed that the Children are both under sixteen. (Pet'r's V. Compl. ¶ 31; Resp't's Resp. to Pet'r's V. Compl. ¶ 31).

wrongful removal or retention." 42 U.S.C. § 11601(a).

■ Under ICARA, a person may file a petition for the return of a child in "any court which has jurisdiction of such action . . . in the place where the child is located at the time the petition is filed." 42 U.S.C. § 11603(b). The inquiry by a Court in a return action under ICARA "is limited to the merits of the abduction claim and not the merits of the underlying custody battle." *Pielage v. McConnell,* 516 F.3d 1282, 1286 (11th Cir.2008) (quoting *Ruiz v. Tenorio,* 392 F.3d 1247, 1250 (11th Cir.2004)).

■ "[T]he party seeking relief under [ICARA] must establish by a preponderance of the evidence that the child has been wrongfully removed or retained within the meaning of the Hague Convention." *Id.* (citing 42 U.S.C. § 11603(e)(1)). Under the Convention, the removal or retention of a child from his or her state of habitual residence is wrongful if the petitioner establishes by a preponderance of the evidence that: (1) the child has been removed or retained in violation of the petitioner's "rights of custody;" and (2) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been exercised but for the removal or retention. 42 U.S.C. § 11603(e)(1)(A); Convention, Arts. 3, 5; *Furnes v. Reeves,* 362 F.3d 702, 712 (11th Cir.2004).

"The Convention defines 'rights of custody' to 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" *Abbott,* 130 S.Ct. at 1989 (quoting Convention, Art. 5). "[T]he

terms 'wrongful removal or retention' and 'wrongfully removed or retained', as used in the Convention, include a removal or retention of a child before the entry of a custody order regarding that child." 42 U.S.C. § 11603(f)(2); *see Moreno v. Martin,* No. 08–22432–CIV, 2008 WL 4716958, at *9 (S.D.Fla. Oct. 23, 2008) ("Moreover, ICARA establishes that a removal or retention is wrongful when it occurs before the entry of a custody order.").

■ If the petitioner meets this burden, the child must be returned to the state of habitual residence unless the respondent establishes by a preponderance of the evidence one of three affirmative defenses: (1) that the petition for return was filed more than one year after the removal or retention and the child is well settled in the new environment;[15] (2) that the petitioner was not actually exercising the custody rights at the time of the removal or retention; or, (3) that the petitioner had consented to or subsequently acquiesced in the removal or retention. *Furnes,* 362 F.3d at 712 (citing 42 U.S.C. § 11603(e)(2)(B); Convention, Arts. 12, 13). Additionally, "[r]eturn is not required if the respondent establishes by clear and convincing evidence that (1) 'there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation,' or (2) the return of the child 'would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.'" *Id.* at 712 n. 8 (citing 42 U.S.C. § 11603(e)(2)(A); Convention, Arts. 13(b), Art. 20.).

---

**15.** "Article 12 of the Hague Convention establishes the general rule that a child who has been 'wrongfully removed or retained' within the meaning of the Convention shall be returned unless more than a year has elapsed between the removal and the date of commencement of the proceedings and the child has become settled." *Furnes v. Reeves,* 362 F.3d 702, 710–11 (11th Cir.2004) (citing Convention, Art. 12; 42 U.S.C. § 11601).

### B. *Rights of custody under the Convention and Spanish law*

■ "The Convention defines 'rights of custody,' and it is that definition that a court must consult." *Abbott*, 130 S.Ct. at 1991.[16] The Convention provides that "rights of custody" are determined by the law of the country in which the child habitually resided at the time of removal. Convention, Art. 3; *Hanley*, 485 F.3d at 645. Rights of custody "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Convention, Art. 3.

■ " 'Rights of custody' is a term of art under the Convention and is "expressly defined" therein, . . . as 'rights relating to the care of the person of the child.' " *Hanley*, 485 F.3d at 645 (citing Convention, Art. 5; *Furnes*, 362 F.3d at 711). In determining what rights of custody exist, the Convention "forecloses [American] courts from relying on definitions of custody confined by local law usage. . . ." *Abbott*, 130 S.Ct. at 1991. A court "must look to the definition of 'rights of custody' set forth in the Convention and not allow . . . our somewhat different American concepts of custody to cloud [the] application of the Convention's terms." *Furnes*, 362 F.3d at 711.

■ "[A] parent need not have 'custody' of the child to be entitled to return of his child under the Convention; rather, he need only have one right of custody." *Id.* at 714. "Further, he need not have a sole or even primary right of custody." *Id.* at 714–15. A parent who has authority under the law of the state of habitual residence to make decisions regarding the personal care, protection, maintenance, and finances of the child, possesses rights of custody that fall "within the ambit of decisions relating to 'the care of the person of the child' within the meaning of Article 5 of the Convention." *See Hanley*, 485 F.3d at 647; *Furnes*, 362 F.3d at 713–14 & 714 n. 11.

■ In 2010, the United States Supreme Court also held that *ne exeat* rights constitute rights of custody under the Convention. *Abbott*, 130 S.Ct. at 1997. A *ne exeat* right "imposes a duty on one parent that is a right in the other." *Id.* at 1988. The right is "by its nature inchoate and so has no operative force except when the other parent seeks to remove the child from the country of habitual residence." *Id.* at 1992. A *ne exeat* right to prohibit the removal of a child from the country of habitual residence is a right of custody under the Convention. *Id.* at 1993.

Non-emancipated children in Spain are under the authority of their parents. C.C., Art. 154. A biological, unmarried parent has the same status under the Spanish Civil Code as a married parent or an adoptive parent. C.C., Art. 108.[17]

---

**16.** In determining if Petitioner has rights of custody under Spanish law, the Court has considered the Petition "together with documents and any other information appended thereto or provided by a Central Authority," as well as "any other documents or information . . . provided after such submission which relates to the application or petition," which includes all documents provided by Respondent and Petitioner in the course of this action. 42 U.S.C. § 11605; Convention, Art. 30; Fed.R.Civ.P. 44.1. The Court has taken judicial notice of the law of Spain, including its judicial and administrative decisions. Convention, Art. 14; Fed.R.Civ.P. 44.1.

**17.** Article 108 of the Spanish Civil Code uses the term "filiation." C.C., Art. 108. Black's Law Dictionary defines "filiation" as "the fact or condition of being a son or daughter; relationship of a child to parent" and as "judicial determination of paternity." *Black's Law Dictionary* (9th ed. 2009).

Spanish parental authority is normally exercised by both parents, or by one of them with the express or tacit consent of the other. C.C., Art. 156. Parental authority includes the duties towards one's children of "looking after them, keeping them in their company, feeding them, educating them and providing them with an integral upbringing." C.C., Art. 154.

"Separation, annulment and divorce shall not exonerate parents from their obligations to their children." C.C., Art. 92.1. When parents are living separately, parental authority will normally be exerted by the parent with whom the child is living. C.C., Art. 156. However, when parents are living separately and do not agree on a custodial arrangement, then a judge will decide which parent will take care of the children under legal age. C.C., Art. 159. A judge may also, on request of the other parent and acting on behalf of the child, assign parental authority to be exerted jointly between the parents. C.C., Arts. 156, 158. All parents under Spanish law, including those who are not granted custodial rights, have the right to keep in touch with their underage children, unless a judicial body determines otherwise. C.C., Art. 160.

An additional component of parental responsibility in Spain is the doctrine of *patria potestad.* This doctrine is codified in the Spanish Civil Code at Articles 154 and 156 and translates, respectively, as "authority of the parents" and "parental authority." C.C., Arts. 154, 156; (Ex. Q to Pet'r's V. Compl.). *Patria potestad* includes the right of a Spanish parent to "make decisions regarding a child's education, well-being, protection, upbringing, and place of residence." *See* C.C., Arts.

154, 156, 160; *Moreno,* 2008 WL 4716958, at *8.[18] *Patria potestad* encompasses more than the parental authorities and responsibilities in the Civil Code and extends to "parental authority over fundamental decisions in the education and upbringing of the child, including where the child is to reside," and "decisions about . . . the children's residence or those which will affect the scholar, health, and religious limits." *Moreno,* 2008 WL 4716958, at *9; (Navarro Legal Opinion at 5 (quoting Conclusions of III Institutional Meeting of Family Judges and Magistrates, Attorneys and Judicial Secretaries, with Lawyers of the Spanish Association of Family Lawyers, Oct. 28–30, 2008)).

"[F]ederal courts have explained that '*patria potestad,*' derived from ancient Roman law and existing in many civil law countries, 'provide[s] for the joint exercise of parental authority. . . .'" *Moreno,* 2008 WL 4716958, at *9 (citing *Garcia v. Angarita,* 440 F.Supp.2d 1364, 1379 (S.D.Fla. 2006); *Lalo v. Malca,* 318 F.Supp.2d 1152, 1155 (S.D.Fla.2004)). The doctrine of *patria potestad* has been relied upon in federal courts in the United States to find that rights of custody exist, as defined in the Convention, for non-custodial fathers in cases arising under ICARA. *Lalo,* 318 F.Supp.2d at 1155–56; *Mendez Lynch v. Mendez Lynch,* 220 F.Supp.2d 1347, 1358 (M.D.Fla.2002); *Moreno,* 2008 WL 4716958, at *9. Where a father has a right of communication with his children, *patria potestad* "plainly means something 'independent' from mere visitation rights" and can serve as a basis for finding rights of custody as defined in the Convention. *See* C.C., Art. 160 (providing for a right of communication with one's children under

---

**18.** Black's Law Dictionary defines "patria potestas" as "[t]he authority held by the male head of a family (the senior ascendant male) over his legitimate and adopted children, as well as further descendants in the male line, unless emancipated." *Black's Law Dictionary* (9th ed. 2009).

Spanish law); *Whallon v. Lynn,* 230 F.3d 450, 458 (1st Cir.2000) (a right of adequate communication with one's children implies a meaningful decision-making role in the life and care of the child, and not the mere access to the child associated with visitation rights).

### C. *Petitioner had rights of custody at the time of removal*

 Under the Convention, rights of custody include "rights relating to the care of the person of a child," and in particular, "the right to determine the child's place of residence." *Furnes,* 362 F.3d at 711. These rights of custody may be based on the law of the state of habitual residence or a judicial decision having legal effect under the law of that state. Convention, Art. 3. Because the Children lived in Spain for their entire lives prior to being removed, Spain is their habitual residence and Spanish law applies in determining Petitioner's rights of custody.[19]

### 1. *Rights of custody under Spanish law*

Spanish parents have the duty of "looking after [their children], keeping them in their company, feeding them, educating them and providing them with an integral upbringing." C.C., Art. 154.[20] Under the doctrine of *patria potestad,* Spanish parents also jointly possess authority over fundamental decisions in the education and upbringing of the child, including where the child is to reside.

These obligations continue even when parents separate. C.C., Art. 92.1. Although parental authority is principally exercised by the parent with whom the children are living during a separation, that authority is not exclusive to that parent and is subject to a judicial determination where there is disagreement. C.C., Arts. 154, 159. When parents cannot agree on a custodial agreement for minor children or the scope of the parental authority each may assert after separating, the Spanish Court determines these issues. C.C., Arts. 156, 159. Until that determination occurs, both parents continue to enjoy the rights of custody afforded to them as parents under Spanish law, to include those specifically enumerated in Articles 154 and 160 of the Spanish Civil Code, as well as those arising from *patria potestad. See* C.C., Arts. 92.1, 154, 156, 159–160.

 Under Spanish law, Petitioner, as a parent, enjoyed authority to communicate with and make decisions regarding the Children that "fall within the ambit of decisions relating to the 'care of the person of the child' within the meaning of Article 5 of the Convention." *See Furnes,* 362 F.3d at 714. This decision-making parental authority qualifies as rights of custody as defined by the Convention and understood by our courts. *See* Convention, Art. 5; *Abbott,* 130 S.Ct. at 1989; *Hanley,* 485 F.3d at 647; *Furnes,* 362 F.3d at 713–14 & 714 n. 11. Thus, the Court finds that Petitioner has established by a preponderance of the evidence that he enjoyed rights of custody under the Convention and Spanish law and that the removal of the Children

---

**19.** It is not disputed by the parties that Spain is the country of habitual residence and Spanish law applies. To the extent that Respondent argues that Georgia law applies in determining rights of custody, that argument is inconsistent with Supreme Court and Eleventh Circuit authority. *See Abbott v. Abbott,* —— U.S. ——, 130 S.Ct. 1983, 1991, 176 L.Ed.2d 789 (2010); *Furnes,* 362 F.3d at 711.

**20.** The parental rights and obligations established in the Spanish Civil Code are in accordance with "rights of custody" as defined by Article 5 of the Convention, which "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." C.C., Arts. 154, 156; Convention, Art. 5.

from Spain violated Petitioner's rights of custody.

### 2. Rights of custody as interpreted by Spanish attorneys

The legal opinions offered by Spanish family law attorneys in support of the Petitioner and Respondent's positions in this litigation, while differing, are helpful to the Court. Both opinions support this Court's finding that Spanish law vested Petitioner with rights of custody at the time of removal.[21]

The Navarro Legal Opinion concludes that at the moment the Children were removed, Petitioner had rights of custody. Much like the Abad Declaration relied upon in *Moreno* to find a non-custodial father had custody rights under Spanish law, the Navarro Legal Opinion explains that Article 156 of the Spanish Civil Code does not strip a father of rights of custody because the Children reside with their mother while the parents are separated. *Moreno*, 2008 WL 4716958, at *9 ("even where one parent is exclusively exercising parental authority in day to day affairs, the other parent maintains possession of parental authority over fundamental decisions in education and upbringing of the child, including where the child is to reside"); (Navarro Legal Opinion at 3–4).

The Navarro Legal Opinion explains that Article 92.1[22] of the Spanish Civil Code must be considered in conjunction with Article 156 to understand that separation does not divest a father of his obligations to, and therefore rights in, his children. (Navarro Legal Opinion at 3–4). Citing the conclusions of a meeting of the Spanish Association of Family Lawyers, the Navarro Legal Opinion explains that rights of custody in the form of "having the children with them" and decision-making authority regarding the Children under the Spanish Civil Code are possessed and shared by both parents during a separation. (*Id.* at 4–5).

The Llorente Legal Opinion offers a differing, but supportive, opinion. (Resp't's Decl. Regarding the Interpretation of Spanish Law ("Llorente Legal Opinion")). Discussing the articles of the Spanish Civil Code and the doctrine of *patria potestad,* the Llorente Legal Opinion states that where a father abandons his family and the mother exercises exclusive and total custody over the Children, rights of custody do not exist for that father. (*Id.* at 3–6).

The Court notes that the Llorente Legal Opinion relied upon facts provided to Attorney Llorente by Respondent that suggested there was a total abandonment by Petitioner in April 2010. Attorney Llorente was not aware there was weekday visitation on Tuesdays and Thursdays between Petitioner and the Children, alternating weekend visitation between Petitioner and the Children, exercise of custodial rights by Petitioner, and that Petitioner was providing financial support for the Children. (*Id.* at 1–2, 6, 10, 14–15). Attorney Llorente also appropriately acknowledged that she had not reviewed the Emergency Petition

---

**21.** In addition to the different evidentiary standards for cases arising under the Convention, Federal Rule of Civil Procedure 44.1 permits this Court to "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence" when seeking to determine issues of foreign law. 42 U.S.C. § 11605; Convention, Arts. 14, 30; Fed.R.Civ.P. 44.1.

**22.** The translation of the Navarro Legal Opinion mistakenly references Article 92.2 of the Spanish Civil Code. Article 92.1 discusses the effect of separation on a parent's obligations to his or her children. C.C., Art. 92.1.

submitted to the Spanish Court on September 24, 2010; any of the Spanish Court's orders of November 24, 2010, and December 9, 2010; or any other documents from the case. (*Id.* at 1 ("It must be clear that for the formulation of this opinion I have not seen any documentation nor with respect to the present proceedings that are being heard in the United States, nor with the actions alleged initiated in Spain by Mr. Felipe Jara Garcia.")). Thus, the Llorente Legal Opinion assumed facts materially different than the facts in this case.

The Court notes further that in discussing the doctrine of *patria potestad* under Spanish law the Llorente Legal Opinion states: "Our Jurisprudence and Doctrine are understanding and defining custody as the habitual and ordinary exercise of the *patria potestad* by the parent who habitually lives with the minor. It normally consists in the daily care and assistance of the minors with whom [the parent] lives with. It is not the same with custody of children, absent both parents are in agreement to exercise a sharing of it, it will be exercised only by one, the one to whom it is placed, giving the other a right of visitation." (*Id.* at 5). Here, Attorney Llorente apparently was unaware that Petitioner and Respondent had an "agreement to exercise a sharing of" their rights of custody under Spanish law. Petitioner did not abandon his family and actually exercised his rights to custody through weekday visitation, alternating weekend habitation with the Children, the provision of financial support for the benefit of the Children, the payment of mortgage and utility bills for Respondent and the Children, and the payment of A.J.H.'s English classes. The Llorente Legal Opinion thus supports the finding that Petitioner had rights of custody under the Spanish Civil Code and the doctrine of *patria potestad* at the time of removal because, amongst other things,

the Children lived with him on weekends and Respondent, by mutual agreement of the parties, did not exercise total or exclusive control over the Children.

Considering both legal opinions, the qualifications of the authors, and the facts relied upon in each opinion, the Court finds that both the Navarro and Llorente Legal Opinions support the Court's finding that the Children were removed in violation of Petitioner's rights of custody. The Court finds the Navarro Legal Opinion to be more persuasive and well reasoned based on the facts of this case and it is consistent with the Court's own independent review and evaluation of the Spanish Civil Code and whether it grants rights of custody to Petitioner as that term is defined in the Convention. The Court notes also that the Llorente Legal Opinion, when read in the context of the facts developed in this proceeding, further supports the rights of custody conclusion the Court reaches in this case.

### 3. Rights of custody established by Spanish judicial decisions

The Court's conclusion that Petitioner had and was exercising rights of custody when the Children were removed from Spain by Respondent is further supported by the December 9, 2010, judicial decisions of the Spanish Court and Spanish Justice Court. These decisions expressly recognized Petitioner's rights of custody under Spanish law with respect to his relationship with the Children as their biological father, including the right to decide where the Children lived. The recognition of these rights led to these Spanish judicial decisions to prevent the Children from departing Spain and to issue a criminal indictment against Respondent based on her wrongful removal of the Children from the country.

The Spanish Court's order of December 9, 2010, made clear that Respondent was prohibited from unilaterally removing the Children from Spain without the Petitioner and the Spanish Court's consent. The Spanish Court's judicial decision pursuant to Article 156 of the Spanish Civil Code in favor of the Petitioner prohibited the departure of the Children from Spain "to save, the minors' interests and their rights to relate to their father." The Spanish Court specifically explained Petitioner's rights as stated in Article 156 of the Spanish Civil Code: "In addition in respect to the article 156 of the Civil Code, Paternal authority will be exercised together by both parents or just by one of them with the other's clear or tacit consent, and in this case there is evidence that the father has expressed his negativity towards leaving the country." (Ex. J to Pet'r's V. Compl. at 2). This is at least an implied, if not an express, acknowledgement by the Spanish Court that Petitioner had a *ne exeat* right to object to and to prohibit the removal of the Children from Spain.[23]

The Spanish Civil Code by its terms, and as interpreted by the Spanish Court judicial decision of December 9, 2010, confirms that Petitioner had rights of custody and a role in deciding where the Children would live. The Court finds that the judicial decision by the Spanish Court supports the finding that Petitioner enjoyed decision-making and parental authority at the time of removal that meets the definition of rights of custody under the Convention and as interpreted by the Eleventh Circuit. *See Hanley,* 485 F.3d at 647; *Furnes,* 362 F.3d at 713–14 & 714 n. 11. The Court also finds that, based on the Spanish Court judicial decision, Petitioner enjoyed a *ne exeat* right to object to and prohibit the removal of the Children that clearly provided him with a right of custody, as defined under the Convention, at the time the Children were removed. *See Abbott,* 130 S.Ct. at 1992–93.

### 4. Consistency with other court decisions

The Court's conclusion that Spanish law vests rights of custody in a biological father is supported by other domestic and foreign courts that have considered this issue. Courts in Florida, Iceland, Ireland, and the United Kingdom have all found in similar circumstances that a non-custodial father has rights of custody under the Convention.[24]

---

**23.** The Llorente Legal Opinion is contrary to the Spanish Court judicial decision of December 9, 2010, to the extent that it states *ne exeat* rights did not exist for Petitioner at the time of removal. The Court again notes the fact that Attorney Llorente did not have the benefit of reviewing the Emergency Petition or the December 9, 2010, judicial determination of the Spanish Court in concluding that *ne exeat* rights did not exist for Petitioner at the time of removal. Attorney Llorente likely would have expressed a different opinion if she had a thorough and accurate understanding of the facts at issue here.

**24.** Respondent represented to the Court during the trial that the cases cited in the Llorente Legal Opinion stood for the proposition that Petitioner did not have rights of custody, as defined under the Convention. (Tr. of Trial 68:12–15). After providing the Court with English translations of those six cases, the Court finds that the cases cited do not support that contention. Five of the cases provided to the Court involve Spanish courts interpreting the law of other nations in determining if a petitioner had rights of custody under the Convention. S.A.P., July 29, 2009 (No. 178/2009, p. 674/2008) (High Provincial Court of Santa Cruz de Tenerife examining what constitutes rights of custody under Venezuelan law where there has also been a divorce decree); S.A.P., May 27, 2008 (No. 193462/2008) (appeal from Court of First Instance, Number 3, Toledo, examining what constitutes rights of custody under Ecuadorian law); S.A.P., Mar. 3, 2008 (No. 54/2008, p. 1113/2007) (Provincial Hearing of Las Palmas examining what constitutes rights of custody under Mexican law where there has also been

In *Moreno,* a United States District Court rejected the argument that Article 156 of the Spanish Civil Code provides that a father has no rights of custody where the child resides with the mother prior to a judicial determination of custody by Spanish courts. 2008 WL 4716958, at *9. The *Moreno* court, relying upon the doctrine of *patria potestad,* the Spanish Civil Code, and a declaration from a Spanish attorney, held that Spanish law grants a non-custodial father rights of custody in his child. *Id.* at *8–*9. The Court also found that weekend visitation discredited that the mother exercised sole and exclusive parental authority such that Article 156 divested the father of rights of custody. *Id.* at *8.

In *M. v. K.,* the Supreme Court of Iceland "[h]aving received information from the Spanish Central Authority on the nature of custody rights in Spanish law ... ruled that the *Patria Potestas* held by the father did indeed amount to rights of custody for the purposes of the Convention." *M. v. K.,* (Iceland S.Ct. June 20, 2000) *available at* http://www.incadat.com (follow "Case Law Search" hyperlink; then search "Case name:" for "*M. v. K.*"). Although there was a separation and divorce decree in *M. v. K.,* the Icelandic Court nonetheless found that *patria potestad* was shared by the parents even where the children lived with the mother. *Id.*

In *P. v. B.,* the Supreme Court of Ireland found that an unmarried, biological father of a child that was removed from Spain had rights of custody. *P. v. B.,*

(Ireland S.Ct. Dec. 19, 1994) *available at* http://www.incadat.com (follow "Case Law Search" hyperlink; then search "Case name:" for "*P. v. B.*"). The Irish Court noted that, like the circumstances here, the parties previously lived together and the country of habitual residence of the child was Spain. The Irish Court concluded that return of the child would properly put custody issues before Spanish courts who could best handle the differences between the parents. *Id.*

In *K v. K,* the English Court of Appeal (Civil Division) found that the President of the English Family Division did not err when he found, after considering expert opinions,[25] that an unmarried father of two children whose habitual residence was Spain had rights of custody under Spanish law. *K v. K,* [2009] EWCA (Civ) 986, [2010] 1 F.L.R. 782 (Eng.).

While none of these domestic and foreign decisions are binding on this Court, their reasoning and conclusions are consistent with the Court's conclusion that Petitioner had rights of custody under the Convention when Respondent removed the Children from Spain.

### D. *Petitioner was exercising rights of custody at the time of removal*

▬▬▬ In determining if there has been an exercise of rights of custody, courts within the Eleventh Circuit have favorably used the standard adopted by the Sixth Circuit that "[t]he only accept-

---

a divorce decree); S.A.P., Sept. 14, 2005 (No. 2086/2005, p. 2259/2005) (Provincial Hearing of Guipuzcoa examining what constitutes rights of custody under English law); S.A.P., Oct. 15, 2002 (No. 68244/2002, p. 280/2002) (Provincial Court of Madrid examining what constitutes rights of custody under Mexican law where there has also been a divorce decree). The sixth case discusses Spanish criminal law regarding whether or not a parent may be guilty of child abduction where there

has been a determination of custody by a Spanish court. S.A.P., Jan. 20, 2005 (No. 33/2005, p. 162/2005) (Provincial High Court of Seville examining what constitutes the crime of parental child abduction under Spanish criminal law).

25. The opinions were differing, but the President found one more persuasive.

able solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *See, e.g., Friedrich v. Friedrich,* 78 F.3d 1060, 1065 (6th Cir.1996); *Bocquet v. Ouzid,* 225 F.Supp.2d 1337, 1347 (S.D.Fla. 2002); *Moreno,* 2008 WL 4716958, at *9; *see also Giampaolo v. Erneta,* 390 F.Supp.2d 1269, 1279 (N.D.Ga.2004) ("Courts in the Eleventh Circuit have found that 'in the absence of a ruling from a court in the country of habitual residence, a court should liberally find 'exercise' where a parent keeps or seeks to keep any sort of regular contact with his or her child.' ") (quoting *In re Cabrera,* 323 F.Supp.2d 1303, 1312 (S.D.Fla.2004)). Additionally, "a person with valid custody rights under the law of the country of the child's habitual residence cannot fail to exercise those rights 'short of acts that constitute clear and unequivocal abandonment of the child.' " *Bocquet,* 225 F.Supp.2d at 1347 (quoting *Friedrich,* 78 F.3d at 1066). Once a court "determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly." *Friedrich,* 78 F.3d at 1066. Lastly, when one parent removes the child without seeking a *ne exeat* holder's consent, it is clearly an instance where the right would have been "exercised but for the removal or retention." Convention, Art. 3(b); *Abbott,* 130 S.Ct. at 1992.

■ The Court finds Petitioner has established by a preponderance of the evidence that he was actually exercising the rights of custody he had under Spanish law at the time of removal. Petitioner sought to be a continual presence and influence in the life of the Children up until the day of their wrongful removal, seeing them every Tuesday and Thursday, living with them every other weekend, providing a variety of financial support to them, and resorting to the Spanish Courts to formally establish his *ne exeat* and custody rights under Spanish law. The Court further finds that Petitioner would have exercised his *ne exeat* right of custody, as validated by the Spanish Court's judicial decision of December 9, 2010, but for the removal of the Children from Spain without Petitioner's knowledge and without his consent.

### E. *Affirmative Defenses*

With regard to the affirmative defenses available to Respondent under the Convention and ICARA, the Court finds that she has not pled, and the record does not establish by a preponderance of the evidence, that the petition for return is untimely or that the Children have become well settled. The Court also finds that Respondent has not pled, and the record does not establish by clear and convincing evidence, that the return of the Children would violate Spanish fundamental principles relating to the protection of human rights and fundamental freedoms or that the return of the Children would expose them to a grave risk of harm or an intolerable situation.

■ The Court finds that Respondent has raised the defenses of consent and abandonment. Consent or "acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich,* 78 F.3d at 1070; *see De Vasconcelos v. De Paula Batista,* No. 4:10–CV–00628, 2011 WL 806096, at *7 (E.D.Tex. Mar. 1, 2011) (applying the *Friedrich* standard for acquiescence); *In*

*re A.V.P.G.*, 251 S.W.3d 117, 126 (Tex.App. 2008) (same).

 Respondent, however, has not offered any factual basis for her claim that Petitioner consented or acquiesced to her removal of the Children to the United States beyond her self-serving testimony that Petitioner said she could take the Children anywhere. The Court, having observed Respondent testify on this matter at trial, finds her testimony unconvincing and not believable. The testimony she offered and the manner in which she offered it showed the testimony to be rehearsed and, on the issue of consent, not credible. Having also had the benefit of observing Petitioner during his testimony, the Court finds highly credible that he did not and would not have consented to the removal of the Children from Spain.

The Court finds Respondent has not met her burden of proving by a preponderance of the evidence that Petitioner consented to the removal of the Children. Convention, Art. 13(a); 42 U.S.C. § 11603(e)(2)(B). The Court further finds that the actions of Petitioner in seeking to preserve his rights of custody through the Spanish Courts prior to the wrongful removal, and subsequently by filing a return action through the Spanish Central Authority, completely undercuts any argument by Respondent that Petitioner consented or acquiesced to the removal of the Children.

 With regard to the affirmative defense of abandonment, this argument is, at most, based on Respondent's contention that Petitioner, having moved five minutes away to reside with his mother, was not actually exercising his custodial rights when the Children were removed. The evidence shows, however, that while Petitioner moved out, he did so in the best interests of the Children, intending to and remaining actively engaged in their lives,

including by being available to care for the Children when Respondent called to say she had to run errands or attend to other matters. (Tr. of Trial 10:22–11:8, 31:11–18). A court cannot find a failure to exercise custody rights by a parent "short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich*, 78 F.3d at 1066; *see Moreno*, 2008 WL 4716958, at *9. There is simply no evidence of abandonment in this case. Rather, the evidence is that Petitioner remained fully engaged in the lives of the Children, consistently acting so as not to disrupt the routine of their lives. The Court finds Respondent has not met her burden of proving that Petitioner was not actually exercising his rights of custody at the time of the removal of the Children or that Petitioner had abandoned the Children. Convention, Art. 13(a); 42 U.S.C. § 11603(e)(2)(B).

The Court finds Petitioner has met his burden of showing by a preponderance of the evidence that the Children were wrongfully removed from Spain in violation of his rights of custody and at the time of removal those rights were actually being exercised. The evidence before the Court compels the conclusion that the Respondent wrongfully removed A.J.H. and F.J.H., without Petitioner's knowledge or consent, from their habitual residence of Spain to the United States.

## III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Petitioner's Verified Complaint and Petition for Return of the Children [1] is **GRANTED** and the Children be **RETURNED** to Spain with Petitioner in accordance with this Order.

**IT IS HEREBY FURTHER ORDERED** that Respondent surrender custo-

dy of the Children to Petitioner no later than 7:00 p.m. on Monday, August 29, 2011, so they may be returned to Spain.

**IT IS HEREBY FURTHER ORDERED** that if Respondent does not surrender the Children to Petitioner by 7:00 p.m. on Monday, August 29, 2011, the United States Marshals Service shall take physical custody of the Children and deliver them to Petitioner.

**IT IS HEREBY FURTHER ORDERED** that the United States Marshals Service may enlist the assistance of other law enforcement authorities, including state and local law enforcement agencies, to execute any portion of this Order.

**IT IS HEREBY FURTHER ORDERED** that Petitioner shall have the exclusive right to the physical and legal custody of the Children until their return to Spain.

**IT IS HEREBY FURTHER ORDERED** that the parties shall reasonably and fully cooperate in making arrangements to accomplish the return of their children to Spain with departure occurring no later than ten (10) days from the date of this Order. In the event the parties are unable or unwilling to cooperate in returning the Children as ordered, either party may seek the assistance of the Court.

**IT IS HEREBY FURTHER ORDERED** that the Children shall not be removed from the United States before 5:00 p.m. on Wednesday, August 31, 2011. This delay is ordered solely for the purpose of permitting Respondent to apply to the Eleventh Circuit Court of Appeals for an emergency stay pending appeal.[26] If a stay is not granted by the Eleventh Circuit

Court of Appeals by 5:00 p.m. on Wednesday, August 31, 2011, Petitioner is allowed to depart for Spain with the Children.

**IT IS HEREBY FURTHER ORDERED** that Respondent pay the actual, reasonable costs and expenses of the Children's transportation to Spain.

**IT IS HEREBY FURTHER ORDERED** that Petitioner shall provide Respondent with a residential address in Spain where he and the Children will reside until the appropriate Spanish court assumes jurisdiction over this matter. Petitioner shall also provide Respondent with a telephone number and an email address through which she can contact him and the Children while in the United States and upon his return to Spain.

**IT IS HEREBY FURTHER ORDERED** that this Order is not a determination of the merits of any custody issues within the meaning of Article 19 of the Convention and the issue of permanent custody of the Children is to be determined by the courts of Spain. Both Respondent and Petitioner, upon their return to Spain, shall submit to the Spanish courts with jurisdiction over the pending custody proceedings for resolution of custody, visitation, and related issues.

**IT IS HEREBY FURTHER ORDERED** that any federal, state, or local law enforcement or other officer enforce this Order and allow Petitioner to remove the Children from the United States of America, and to allow him to accompany them to the country of Spain, giving him the right, without interference, to have the Children in his lawful custody at all times.

**IT IS HEREBY FURTHER ORDERED** that Petitioner is instructed to

---

26. *See Diorinou v. Mezitis,* 237 F.3d 133, 138 (2d Cir.2001) (noting that district court which granted Hague Convention petition had "helpfully stayed its order" of return for a period of two days to permit respondent to seek a stay pending appeal from the Court of Appeals).

file, on or before Wednesday, September 7, 2011, his application for allowable fees and expenses in seeking this return order, stating in detail each legal service performed in this matter, the time to perform each such service, and the hourly billing rate of the person by whom the service was provided. Each specific cost and expense incurred shall be itemized, including the costs for Petitioner's travel to and from the United States in connection with this matter and the costs for the Children to be returned to Spain. Petitioner's application shall provide the background and litigation experience for each attorney performing services in this matter. The application shall be accompanied by Petitioner's legal memorandum discussing the basis for an award of attorney's fees, costs, and expenses in this matter. The Respondent shall respond to Petitioner's brief on or before Monday, September 12, 2011, with any objections as to the requests of Petitioner or why such an order would be clearly inappropriate. The Petitioner shall reply on or before Friday, September 16, 2011.